## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

JOHN BULTHOUSE Individually and as
Personal Representative for the Estate of
Paul Bulthouse, Deceased

     PLAINTIFF

     -vs-                                    Case No.

                                                HON.

COUNTY OF MUSKEGON, a municipal corporation, and
SHERIFF MICHAEL POULIN; LT. MARK BURNS;
SGT. DAVID VANDERLAAN; DEPUTY BRITTANY MILLER;
DEPUTY JESSIE OLSON; DEPUTY CRYSTAL GREVE;
DEPUTY JUSTIN WALL; DEPUTY CHRISTOPHER GRAVIANO;
DEPUTY BRADLEY PERRI; DEPUTY JAMAL LANE;
DEPUTY JEFFERY PATTERSON; DEPUTY SHAWN BAKER;
and other UNKNOWN DEPUTIES;
WELLPATH, LLC, formerly known as CORRECT CARE SOLUTIONS, LLC;
JOSEPH NATOLE, JR., M.D. P.C.; DR. JOSEPH NATOLE, M.D.;
CARLEEN BLANCHE, RN; AUBREY SCHOTTS, RN;
JESSICA ANN FAIRBANKS, LPN; ASHLEIGH SEVERANCE, LPN;
DANIELLE CARLSON, LPN; DAVID LOPEZ, LPN;
RICHELE MARION, EMT; BRITNI BRINKMAN, EMT;
SARA BRUCE, EMT; JANE DOE; and JOHN DOE;
Individually, and in their official / supervisory capacities,
Jointly and Severally,

     DEFENDANTS.                        JURY TRIAL DEMANDED
_____/

**MARCEL S. BENAVIDES (P69562)**
THE MARCEL S. BENAVIDES LAW OFFICE
Attorney for PLAINTIFF
801 West Eleven Mile Rd. Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net
_____/

## COMPLAINT AND JURY DEMAND

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

**NOW COMES** the PLAINTIFF, John Bulthouse, individually and as Personal Representative for the Estate of Paul Bulthouse ("Decedent"), and through his attorney, **MARCEL S. BENAVIDES**, and for his complaint against Defendant County of Muskegon ("Defendant Muskegon County"), Muskegon County Sheriff Michael Poulin ("Defendant Sheriff Poulin"), Lieutenant Mark Burns ("Defendant Lt. Burns"), Sergeant David Vanderlaan ("Defendant Sgt. Vanderlaan"), Deputy Brittany Miller ("Defendant Deputy Miller"), Deputy Jessie Olson ("Defendant Deputy Olson"), Deputy Crystal Greve ("Defendant Deputy Greve"), Deputy Justin Wall ("Defendant Deputy Wall"), Deputy Christopher Graviano ("Defendant Deputy Graviano"), Deputy Bradley Perri ("Defendant Deputy Perri"), Deputy Jamal Lane ("Defendant Deputy Lane"), Deputy Jeffery Patterson ("Defendant Deputy Patterson"), Deputy Shawn Baker ("Defendant Deputy Baker"), and Unknown Muskegon County Deputies ("Unknown Defendant Deputies"), Wellpath, LLC, formerly known as Correct Care Solutions, LLC ("Defendant Wellpath"), Joseph Natole, Jr. MD PC ("Defendant Joseph Natole, Jr. MD PC"), Dr. Joseph Natole, MD ("Defendant Dr. Natole"), Carleen Blanche, RN ("Defendant Carleen Blanche, RN"), Aubrey Schotts, RN ("Defendant Aubrey Schotts, RN"), Jessica Ann Fairbanks, LPN ("Defendant Jessica Fairbanks, LPN"), Ashleigh Severance, LPN ("Defendant Ashley Severance, LPN"), Danielle Carlson, LPN ("Defendant Danielle Carlson, LPN"), David Lopez, LPN ("Defendant David Lopez, LPN"), Richele Marion, EMT ("Defendant Richele Marion, EMT"), Britni Brinkman, EMT ("Defendant Britni Brinkman, EMT"), Sara Bruce, EMT ("Defendant Sara Bruce, EMT");

Collectively, Defendant Sgt. Vanderlaan, Defendant Deputy Miller, Defendant Deputy Olson, Defendant Deputy Greve, Defendant Deputy Wall, Defendant Deputy Graviano, Defendant Deputy Perri, Defendant Deputy Lane, Defendant Deputy Patterson, Defendant Deputy Baker, and Unknown Defendant Deputies hereinafter referred to as "Defendant Deputies;"

Collectively, Defendant Dr. Natole, Defendant Carleen Blanche, RN, Defendant Aubrey Schotts, RN, Defendant Jessica Fairbanks, LPN, Defendant Ashley Severance, LPN, Defendant Danielle Carlson, LPN, Defendant David Lopez, LPN, Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, hereinafter referred to as "Defendant Medical Personnel;" states as follows:

## INTRODUCTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Decedent, Paul Bulthouse's, and PLAINTIFF's rights as secured by the United States Constitution.

2.     The events that gave rise to this complaint began on March 22, 2019, and culminated with the completely senseless death of Paul Bulthouse on April 4, 2019. All named Defendants caused the death of Paul Bulthouse by continuously violating his constitutional rights.

3.     Defendants' unconstitutional actions by way of some examples include but are not limited to discontinuing Paul Bulthouse's prescription medication, forcing him into life-threatening withdrawal, neglecting his severe and fatal withdrawal symptoms, and allowing him to descend into a state of acute withdrawal psychosis whereupon he exhibited bizarre behavior including observation of documented visual and auditory hallucinations; using excessive force in response to his medical condition rather than providing him with desperately needed medical care, ignoring his serious physical injuries and critical mental health needs, failing to ensure adequate

3

nourishment and hydration despite his own inability to meet those essential needs, detaining him under inhumane conditions of confinement where he experienced cruel and unusual punishment, otherwise forcing him to endure extreme and needless pain and suffering; conducting an incompetent medical withdrawal tapering plan/regimen schedule where he was permitted to go deeper into severe withdrawals ultimately experiencing status epilepticus; observing him sustain numerous seizures and status epilepticus both in person and viewing on camera (or ignoring the video surveillance of same over a long period of time); and simply not offering medical attention to his emergency medical needs ultimately causing his death.

4.      Following this senseless tragedy, Defendant Muskegon County and Defendant Wellpath, embarked on an effort to cover up the circumstances surrounding the death of Paul Bulthouse. Through its agents and officials, Defendant Muskegon County and Defendant Wellpath knowingly conducted a sham and fraudulent death investigation to conceal the unconstitutional conduct alleged herein. They also wrongfully withheld critical information from Paul Bulthouse's next of kin, attorneys retained by his family, and public officials responsible for determining the causes leading to his death. In fact, the sham investigation was finally exposed to the public, when upon learning of the coverup by Defendants, including but not limited to, Defendants Wellpath and Muskegon County, Defendant Sheriff Poulin, Defendant Lt. Burns, Defendant David Lopez LPN, and other various individual named Defendants, the State of Michigan Attorney General's Office chose to conduct an investigation into the wrongdoing of the named Defendants in this complaint.

## JURISDICTION & VENUE

5.     That this Court has jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 1331, 1367, 1343, and 42 USC §1983 and also has pendent jurisdiction over all state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims.

6.     Venue is proper under 28 U.S.C. § 1391 (b) as the events giving rise to the claims asserted in this complaint occurred within this District.

7.     This is a civil action brought pursuant to the Civil Rights Act, 42 U.S.C. §1981, *et seq.*, seeking monetary and punitive damages against Defendants under 42 U.S.C. §1983, and costs and attorney fees under 42 U.S.C. §1988, for violations of Plaintiff's rights under the Fourth, Eighth and/or Fourteenth Amendments of the United States Constitution.

8.     That Plaintiff brings this suit against each and every Defendant in both their individual and official capacities. That upon information and belief all named individual defendants are residents of the State of Michigan.

9.     That each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws and customs, and by virtue of, and under the authority of the color of law and such actions were performed in the course and scope of employment of each individual Defendant.

10.     That the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

## PARTIES

A.  Plaintiff

11.     PLAINTIFF, John Bulthouse, the father of Decedent Paul Bulthouse, is a resident of the County of Muskegon, State of Michigan.  Plaintiff is the duly appointed Personal

Representative of the Estate of Paul Bulthouse and files this lawsuit in both his individual and his representative capacity.

12.     Decedent, Paul Bulthouse, was a 39-year-old man that was incarcerated at the Muskegon County Jail at the times of the events at issue in this case as a pretrial detainee as more fully described below.

B. <u>Muskegon County Defendants:</u>

13.     Defendant Muskegon County, at the times of the events at issue in this case is a municipal corporation located in the County of Muskegon, State of Michigan who is responsible for providing professional and responsive health care for the inmates, who are pretrial detainees and convicted jailers, at the Muskegon County Jail. All pretrial detainees and/or jailers are entitled to protection under the 14th Amendment to the United States Constitution.

14.     Defendant Muskegon County is liable under state and/or federal law for all injuries proximately caused by: intentional, willful and wanton, reckless, deliberately indifferent, grossly negligent and/or negligent acts and/or omissions committed pursuant to customs, policies, usage and/or practices which deprive citizens of their rights, privileges and/or immunities secured by the Constitutions and laws of the United States and/or of the State of Michigan.

15.     Defendant Muskegon County contracted with one or more private individuals and corporate entities to provide medical care and other services to its population of pre-trial detainees and convicted jailers.

16.     Defendant Sheriff Michael Poulin ("Defendant Sheriff Poulin"), in his official capacity, at the times of the events at issue in this case is the Sheriff of Muskegon County, was at all relevant times a Muskegon County agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. Defendant Sheriff Poulin is a final policymaker for Muskegon County, with respect to all matters concerning the Muskegon

County Sheriff's Office and all of its divisions, including the Muskegon County Jail and is being named for the causes of actions in this complaint in both his official and individual capacities. As all times relevant to the events at issue in this case, Defendant Sheriff Poulin promulgated rules, regulations, policies and procedures as Sheriff of Muskegon County for the provision of certain medical care, including medical screening of and administration of medication to the inmates at the Muskegon County Jail. He is a resident of the State of Michigan.

17.     Defendant Lt. Mark Burns ("Defendant Lt. Burns"), at the times of the events at issue in this case was a supervising deputy, an agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. Defendant Lt. Burns was the Muskegon County Sheriff's Office Jail Administrator at the times of the events at issue in this case and a final policymaker for Defendant Muskegon County, with respect to all matters concerning the Muskegon County Sheriff's Office and all of its divisions, including the Muskegon County Jail and is being named for the causes of actions in this complaint in both his official and individual capacities. He is a resident of the State of Michigan.

18.     Defendant Sgt. David Vanderlaan (Defendant Sgt. Vanderlaan") at the times of the events at issue in this case was a supervising deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

19.     Defendant Deputy Brittany Miller ("Defendant Deputy Miller") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of her employment. She is a resident of the State of Michigan.

20.     Defendant Deputy Jessie Olson ("Defendant Deputy Olson") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County,

and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

21.     Defendant Deputy Crystal Greve ("Defendant Deputy Greve") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of her employment. She is a resident of the State of Michigan.

22.     Defendant Deputy Justin Wall ("Defendant Deputy Wall") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

23.     Defendant Deputy Christopher Graviano ("Defendant Deputy Graviano") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

24.     Defendant Deputy Bradley Perri ("Defendant Deputy Perri") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

25.     Defendant Deputy Jamal Lane ("Defendant Deputy Lane") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

26.     Defendant Deputy Jeffery Patterson ("Defendant Deputy Patterson") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon

County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

27.     Defendant Deputy Shawn Baker ("Defendant Deputy Baker") at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

C.  <u>Wellpath (F/K/A Correct Care Solutions) Defendants:</u>

28.     On or about April 4, 2019, and at all times relevant to the events at issue in this case, Wellpath, formerly known as Correct Care Solutions ("Defendant Wellpath") was a Tennessee corporation, licensed to do business in the State of Michigan, registered agent Corporate Creations Network, Inc., under contract with Muskegon County to furnish medical care to inmates incarcerated at the Muskegon County Jail. In its capacity as a contractor to Defendant Muskegon County, Defendant Wellpath promulgated rules, regulations, policies, and procedures for the medical screening, medical treatment, and overall medical care of inmates at the Muskegon County Jail, including Paul Bulthouse. Defendant Wellpath's policies were implemented by and through its employees including the individual defendant medical care personnel, who were responsible for the medical care of the inmates at the Muskegon County Jail. In its capacity as a contractor to Defendant Muskegon County, through the Muskegon County Sheriff's Office, Defendant Wellpath was, at all times relevant hereto, acting under color of law, considered a person and is properly sued under 42 USC § 1983.

29.     On or about April 4, 2019, and at all times relevant to the events at issue in this case, Joseph Natole, Jr., M.D. P.C. ("PC") was a Michigan corporation which conducted business in the City of Muskegon, County of Muskegon, State of Michigan.

30.     On or about April 4, 2019, and at all times relevant to the events at issue in this case, Defendant Dr. Joseph Natole, MD ("Defendant Dr. Natole") of Dr. Joseph Natole MD PC, State of Michigan registered agent Joseph Natole, Jr., MD, was upon information and belief, a Board Certified Family Practice Physician who is licensed to practice medicine in the State of Michigan, who conducted business in the City of Muskegon, County of Muskegon, State of Michigan, and is being sued herein in his individual capacity and official capacity. Upon information and belief, Defendant Dr. Natole was employed by Defendant Wellpath as the Medical Director of the Muskegon County Jail. As such, Defendant Dr. Natole was a supervising medical personnel, a final policymaker for Wellpath and had final authority to and did promulgate rules, regulations, policies and procedures as Medical Director of the Muskegon County Jail for the provision of certain medical care, including screening, care of, and administration of medication to inmates at Muskegon County Jail, by all medical care providers such as nurses, doctors, and emergency medical technicians/paramedics employed at Muskegon County Jail. Defendant Dr. Natole's policies were implemented by and through Defendant Wellpath employees and Muskegon County Sheriff employees, who were responsible for the medical care of inmates at Muskegon County Jail, including Paul Bulthouse, where Dr. Natole supervised the medical care personnel. As such, Defendant Dr. Natole was acting under color of law. He is a resident of the State of Michigan.

31.     On or about April 4, 2019, and at all times relevant to the events at issue in this case, Defendant David Lopez, licensed practical nurse ("Defendant David Lopez, LPN"), was upon information and belief, employed by Defendant Wellpath as the Health Services Administrator of the Muskegon County Jail. As such, Defendant David Lopez, LPN, was also a supervisor and final policymaker for Defendant Wellpath and had final authority to and did promulgate rules, regulations, policies and procedures as the Health Services Administrator of the

Muskegon County Jail for the provision of certain medical care, including screening, care of, and administration of medication to inmates at Muskegon County Jail, by medical care personnel such as nurses and emergency medical technicians/paramedics, employed at Muskegon County Jail. Defendant David Lopez, LPN's policies were implemented by and through Defendant Wellpath and Muskegon County Sheriff's Office employees including the individual Defendant medical care personnel, who were responsible for the medical care of inmates at Muskegon County Jail, including Paul Bulthouse. On or about April 4, 2019, and at all times relevant to the events at issue in this case, Defendant David Lopez, LPN, also acted as the supervisor of all nurses, emergency medical technicians and paramedics employed at Muskegon County Jail and was also responsible for the provision of medical care, treatment, medication to and the welfare of inmates, including Paul Bulthouse, while detained at the Muskegon County Jail. As such, Defendant Lopez, LPN, was acting under color of law. He is a resident of the State of Michigan.

32.   Defendant, Carleen Blanche, registered nurse ("Defendant Carleen Blanche, RN"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan.

33.   Defendant, Aubrey Schotts, registered nurse ("Defendant Aubrey Schotts, RN), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

34.     Defendant, Jessica Ann Fairbanks, licensed practical nurse ("Defendant Jessica Fairbanks, LPN"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

35.     Defendant, Ashleigh Severance, licensed practical nurse ("Defendant Ashleigh Severance, LPN"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

36.     Defendant, Danielle Carlson, licensed practical nurse ("Defendant Danielle Carlson, LPN"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

37.     Defendant, Richele Marion, emergency medical technician ("Defendant Richele Marion, EMT"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as an emergency medical technician at the Muskegon County Jail who was responsible for the provision of medical care, treatment, life support, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

38.     Defendant, Britni Brinkman, emergency medical technician ("Defendant Britni Brinkman, EMT"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as an emergency medical technician at the Muskegon County Jail who was responsible for the provision of medical care, treatment, life support, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

39.     Defendant, Sara Bruce, emergency medical technician ("Defendant Sara Bruce, EMT"), at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as an emergency medical technician at the Muskegon County Jail who was responsible for the provision of medical care, treatment, life support, medication to and the welfare of inmates, including Decedent, while detained at the Muskegon County Jail. She is a resident of the State of Michigan.

D. Unknown Defendants:

40.     Defendants, Muskegon County and Wellpath, through its representatives and agents, including Defendants, Sheriff Poulin and Lt. Burns, wrongfully concealed and withheld important information, such as jail and medical records as well as video recordings, from public officials, Paul Bulthouse's next of kin, and attorneys representing the estate. Thus, making it nearly impossible to identify additional defendants at the time of the filing of this complaint.

41.     Following the death of Paul Bulthouse, multiple lawful requests for information were issued to both the Muskegon County Sheriff's Department and to Defendant Wellpath by a variety of state agencies, including attorneys representing his family.

42.     By conducting a fraudulent investigation and refusing to provide relevant information in response to these lawful requests, it was the intent of Defendants, Muskegon County

13

and Wellpath, and its representatives to deprive interested parties from learning material information that would have shown, among other things, the identity of individuals and entities who inflicted constitutional violations against Paul Bulthouse, the full nature and extent of those violations, and information that would have shed light on the length of time he suffered from being denied medical attention and to further explain the cause of his death.

43.     Defendants, Muskegon County and Wellpath, and its agents, including Defendants Sheriff Poulin and Lt. Burns, withheld and continue to withhold, inter alia, video recordings of the events in question and critical materials and information identifying who was involved, when such involvement occurred, and the nature of the involvement of individuals.

44.     It is anticipated that Plaintiff will amend this complaint by naming those parties identified in discovery that are presently not known due to Defendants, Muskegon County and Wellpath, deliberately, fraudulently and wrongfully concealing the information.

**FACTS**

45.     This claim involves the tragic death of Paul Bulthouse, that occurred on April 4, 2019, while he was incarcerated at the Muskegon County Jail.

46.     Paul Bulthouse was prescribed a high daily dosage of 2 mg of Klonopin to be taken up to five times a day, which is a psychotropic prescription medication within a group of drugs called benzodiazepines. Generically known as Clonazepam, Klonopin is commonly prescribed by physicians to treat anxiety disorders and various other mental and physical conditions. Individuals who regularly use Klonopin over time become dependent on the medication. When a person who is dependent on Klonopin abruptly stops taking the medication or reduces the dosage too quickly, he or she will go into withdrawal.

14

47.    Paul Bulthouse also drank alcohol. Alcohol withdrawal is the change the body goes through when a person suddenly stops drinking after prolonged and heavy alcohol use. Symptoms of alcohol withdrawal include trembling (shakes), insomnia, anxiety, and other physical and mental symptoms. Delirium tremens, a severe form of alcohol withdrawal, which involves sudden and severe mental or nervous system changes, can cause seizures and be a life-threatening condition if appropriate medical treatment and care is not provided.

48.    Benzodiazepine withdrawal is a serious medical condition that can be life-threatening if not treated appropriately. All reasonable health care providers, including those in the field of corrections, are aware of the symptoms of benzodiazepine withdrawal and its potentially fatal consequences. All reasonable health care providers, including those in the field of corrections, are also aware of the symptoms of alcohol withdrawal and its potentially fatal consequences. Symptoms of serious benzodiazepine withdrawal can include, among other things, abnormal vital signs, acute GI distress, loss of appetite and weight loss, profound disturbances in sleep, severe anxiety and panic, mood swings, paranoia, extreme restlessness and agitation, tremors, hyperthermia, excessive perspiration, bizarre behavior, confusion and cognitive difficulties, hallucinations, delirium, psychosis, and seizures.

49.    Withdrawal is physically, mentally, and emotionally torturous. Depending on the nature of the benzodiazepine, the dosage and duration of use, and other individual circumstances, benzodiazepine withdrawal syndrome can be drawn out over a period of 5 to 28 days—with symptoms peaking roughly two weeks following the discontinuance or abrupt reduction in the medication. Acute, late-stage benzodiazepine withdrawal is a serious medical emergency, which carries a well-recognized and significant risk of death, and requires hospitalization.

50.    Upon admission to any correctional facility, it is essential to identify any person who may be using a benzodiazepine in order to prevent serious complications and/or death. Due

to the extraordinary risks associated with benzodiazepine withdrawal, a person's Klonopin dosage should never be abruptly discontinued or even reduced without a carefully controlled plan of gradual dose reduction instituted under the guidance of trained medical personnel—with close medical monitoring in an appropriate setting. All medical providers in a county correctional facility must know the risks of benzodiazepine withdrawal and must be able to recognize the signs and symptoms thereof. Non-medical detention staff must also be aware of the signs, symptoms, and potentially fatal consequences of benzodiazepine withdrawal.

51.    The trained medical personnel must monitor whether the withdrawal tapering schedule is effective throughout the duration of the tapering regimen and make a determination whether it was effective at the end of the scheduled days. The trained medical personnel must reevaluate the patient to amend or reinstitute a tapering schedule with a course of medication, if necessary, to fit the needs of an individual who is still symptomatic after and/or during the original regimen. Otherwise, the individual will continue to experience withdrawals and possible death.

52.    For many years, Paul Bulthouse was under the care of medical providers who prescribed him Klonopin. As of April 2019, Paul Bulthouse was prescribed up to 10 mg of Klonopin per day pursuant to his prescription. He was physically dependent on the medication and at serious risk for alcohol and/or benzodiazepine withdrawal should it be abruptly discontinued, the dosage be reduced too quickly, or an ineffective tapering schedule be used.

53.    Status epilepticus is a medical emergency that starts when a seizure lasts longer than expected, usually considered around five minutes, or having more than one seizure within a five-minute period, without returning to a normal level of consciousness between episodes. Status epilepticus can occur as nonconvulsive status epilepticus or convulsive status epilepticus. Nonconvulsive status epilepticus occurs when a person appears confused or looks like they are daydreaming, unable to speak, or behaving in an irrational way. Convulsive status epilepticus is

the more dangerous condition and can lead to long term brain injury or death. Convulsions may involve jerking motions, grunting sounds, drooling, and rapid eye movements. Loss of control over bowels and bladder along with difficulty breathing is common. Convulsive status epilepticus requires emergency treatment by trained medical personnel in a hospital setting. Seizures and status epilepticus are potential adverse events after abrupt withdrawal of chronically used benzodiazepines. It can occur in individuals who present with alcohol or drug withdrawal symptoms and/or during mismanagement of medical care while withdrawing from a benzodiazepine such as Klonopin. It is life-threatening and getting immediate treatment in a hospital is absolutely vital. As described below, Paul Bulthouse experienced nonconvulsive and convulsive status epilepticus episodes that were personally observed by the individual Defendants named in this complaint on multiple dates. The individual Defendants were deliberately indifferent to this serious medical need by simply not taking Paul Bulthouse to a hospital when he suffered from serious medical needs. The individual Defendants, however, deliberately made the choice to be indifferent to his serious medical needs and allowed him to suffer through each seizure, which occurred throughout multiple days until his body shut down. He died of the very condition, namely status epilepticus, that the individual Defendants personally watched him experience as he progressed closer to death, day by day.

54.     When Paul Bulthouse arrived at the jail on March 22, 2019, he was screened by both jail intake officers and medical personnel. He was being housed at the Muskegon County Jail as a pretrial detainee awaiting disposition for a violation of probation show cause hearing. He was unable to post his cash bond.

55.     Paul Bulthouse was screened by Deputy Stephenson at his jail initial intake screening on March 22, 2019, weighing 211 pounds as a 6'1" man. He was prescribed Klonopin for his mental health, he drank alcohol and took the beta blocker, Lopressor, for his heart issues,

all of which Deputy Stephenson memorialized in the intake screening report. Paul Bulthouse had

no history of experiencing seizures. On the date of his death of April 4, 2019, Paul Bulthouse had

lost twelve pounds in thirteen days.

56.     Deputy Stephenson noted that Paul Bulthouse was suicidal, and recently

institutionalized at "Brinks" for suicide. He was given a suicide gown and transferred to "medical."

57.     Also on March 22, 2019, Defendant Jessica Fairbanks LPN, placed a suicide hold

on Decedent as indicated in Muskegon County Sheriff Incident Report, stating "Meds will be

verified, To REMAIN In HD for w/d[1] checks," to remain in "HD until cleared" for suicide watch

by Healthwest and further stated that Decedent was "Medically cleared." Paul Bulthouse was then

placed into a suicide watch cell that was monitored with 24-hour live video surveillance by jail

deputies.

58.     Defendant David Lopez, LPN, is the Health Administrator at the Muskegon County

Jail as an employee of Defendant Wellpath. Paul Bulthouse's jail medication form confirms

Defendant David Lopez, LPN, is a supervising agent of Defendant Wellpath as the order states:

"Noted by: Lopez, David Supervisory Staff 03/22/2019."    Defendant David Lopez, LPN,

maintained the supervisory role over all Defendant Wellpath nurses employed at Muskegon

County Jail at all times relevant to the events stated in this complaint. On the date of death,

Defendant David Lopez was one of only two Wellpath employees, the other being the offsite

regional corporate representative, that met with the Muskegon County Sheriff Department's top

brass to discuss the matter.

59.     On the intake date of March 22, 2019, Defendant David Lopez, LPN, prepared a

"Medication / Treatment Request" for Paul Bulthouse including his vital signs and a chart of

---

[1] Upon information and belief, "w/d" is a shorthand medical abbreviation for the word
"withdrawal."

"Medications Verified." The handwritten Medication form indicated that Paul Bulthouse used the Meijer store pharmacy to fill his prescriptions. The handwritten chart indicated Paul Bulthouse's dosages for "lopressor" and "Clonopin [sic]," the last fill date for each prescription and Defendant David Lopez, LPN's, initials in the corresponding box for "OK by Dr." The form also states "Attention: Dr. Natole" and has a fax time stamp of March 25, 2019.

60.     It is purported on a Defendant Wellpath "Medication Order" form dated March 22, 2019, at 2:59 pm, Defendant Dr. Natole ordered Paul Bulthouse to presumably engage in an alcohol withdrawal tapering schedule where Paul Bulthouse would receive a five-day regimented decreasing dosage of chlordiazepoxide (Librium) and thiamine (vitamin b). The Medication Order indicates that the Order Overview is noted by "Lopez, David Supervisory Staff" on March 22, 2019, at approximately 3:07-08 pm. Another Medication Order was charted on March 25, 2019, indicating that at 1:14 pm, Defendant Dr. Natole prescribed Lopressor. That Order Overview is noted by Defendant Ashleigh Severance LPN, on March 25, 2019, at 1:14 pm. The order record history for both of the Medication Orders completed by Defendant David Lopez, LPN, and Defendant Ashleigh Severance, LPN, only indicate "Diagnosis: Alcohol abuse, uncomplicated, Essential (primary) hypertension, Fibromyalgia."

61.     In light of the five-day tapering scheduled allegedly ordered on March 22, 2019 by Defendant Dr. Natole via Defendant David Lopez, LPN, Dr. Natole did not conduct any physical medical examination of Paul Bulthouse prior to or during the tapering regimen, and did not see Paul Bulthouse until March 29, 2019. Defendant Dr. Natole's tapering schedule was wholly insufficient to meet the needs of Paul Bulthouse due to his long-term daily high dosage of the benzodiazepine Klonopin and / or alcohol withdrawal. The insufficient length of time ordered for the tapering of Paul Bulthouse's use of Klonopin and/or alcohol, the lack of an appropriate dosage of a substitute benzodiazepine to ween him from the daily use of Klonopin and/or alcohol, and the

lack of supervision during and after the tapering schedule by all medical personnel, including all named individual Defendants, caused Paul Bulthouse to deteriorate to the point that he died of status epilepticus.

62.     The Clinical Institute Withdrawal Assessment of Alcohol Scale-revised (CIWA-Ar) is a tool that can be used to objectively assess patients for the development of alcohol withdrawal syndrome. By using the CIWA-Ar to assess patients, medical personnel and nurses can quantify the potential for the development of alcohol withdrawal syndrome and therefore initiate treatment for patients who require therapy. The CIWA-Ar encompasses ten areas of assessment—nausea and vomiting, tremor, paroxysmal sweats, anxiety, agitation, tactile disturbances, auditory disturbances, visual disturbances, headache and or fullness in the head, and orientation.

63.     The Federal Bureau of Prisons indicates in its relevant clinical guidelines that the CIWA-Ar monitoring scale in not to be used for benzodiazepine withdrawal assessments, that no objective measure or scoring system has been validated to assess benzodiazepine withdrawal, and that individuals should be given a targeted physical examination, laboratory evaluations and treated with the benzodiazepine Clonazepam as the tapering drug. Clonazepam is sold under the brand Klonopin, which is the exact controlled substance that Paul Bulthouse was prescribed and not given in this case. The Federal Bureau of Prisons clinical guidance also states that an individual experiencing the benzodiazepine late withdrawal symptoms, such as a delirium with hallucinations, changes in consciousness, profound agitation, autonomic instability, and seizures, should be hospitalized.

64.     The CIWA-Ar evaluation was used to assess Paul Bulthouse from March 22-27, 2019, during his insufficient 5-day withdrawal tapering regimen ordered by Defendant Dr. Natole. The CIWA-Ar assessments were to be supervised by Defendant Dr. Natole, MD, and Defendant David Lopez, LPN, and were conducted by Defendants, Aubrey Schotts, RN, Britni Brinkman,

EMT, Danielle Carlson, LPN, Sara Bruce, EMT, Ashleigh Severance, LPN, Jessica Fairbanks, LPN, and Richele Marion, EMT, as indicated by their initials on the CIWA-Ar assessments and their various reports.

65.     Based on the subjective scoring, medical personnel are ordered to contact a "HCP," otherwise known as a health care professional, when certain vital signs are outside of the parameters, when the CIWA-Ar scoring is rising at certain levels between assessment times, and when the overall CIWA-Ar scoring is at a certain threshold.

66.     On March 22, 2019, and multiple times on March 23, 24 and 25, 2019, Paul Bulthouse's vitals and/or CIWA-Ar scoring, specifically (i) his extremely high pulse on multiple dates, (ii) his final CIWA-Ar score being too high (measuring in the moderate to severe range), and (iii) his final CIWA-Ar scoring rose too high between assessments, mandated that the assessing Defendant Aubrey Schotts, RN, Defendant Britni Brinkman, EMT, Defendant Danielle Carlson, LPN, Defendant Sara Bruce, EMT, Defendant Ashleigh Severance, LPN, Defendant Richele Marion, EMT, and Defendant Jessica Fairbanks, LPN, contact or consult with a healthcare professional and that the assessing medical personnel "document guidance and orders given" by such healthcare professional.  The CIWA-Ar assessment sheet indicates that upon scoring that mandates contact/consultation with HCP, the assessor consults with the healthcare professional using "SBAR" formatting, which is a highly powerful communication tool between nurses and prescribers to provide written information about the Situation / Background / Assessment / and Recommendation of a patient. Defendants, Aubrey Schotts, RN, Britni Brinkman, EMT, Danielle Carlson, LPN, Sara Bruce, EMT, Ashleigh Severance, LPN, Richele Marion, EMT, and Jessica Fairbanks, LPN, did not contact the healthcare professional when the assessment mandated such a communication ultimately contributing to the deterioration of Paul Bulthouse's health causing his death as they were deliberately indifferent to his serious medical needs.

67.     Pleading in the alternative, Aubrey Schotts, RN, Britni Brinkman, EMT, Danielle Carlson, LPN, Sara Bruce, EMT, Ashleigh Severance, LPN, Richele Marion, EMT, and Jessica Fairbanks, LPN, did contact the healthcare professional, namely Defendant Dr. Natole or Defendant David Lopez, LPN, or unknown Defendant, when the assessment mandated such a communication,  but, Defendant Dr. Natole and Defendant David Lopez, LPN, did nothing to assist Paul Bulthouse's health deterioration as they were deliberately indifferent to his serious medical needs.

68.     Defendant Wellpath utilized Defendant Britni Brinkman, EMT, Defendant, Sara Bruce, EMT, and Defendant Richele Marion, EMT, who were neither nurses nor individuals trained or qualified to conduct the CIWA-Ar assessments on the various dates as stated above, nor were they qualified nurses to provide nursing care for Paul Bulthouse or to individuals who exhibited symptoms of severe withdrawals and seizures. Defendant Sara Bruce, EMT, and Defendant Richele Marion, EMT, who as agents of Defendant Wellpath, were unqualified to be practicing in a nursing capacity for individuals who were specifically being monitored for continued withdrawal symptoms, mental health issues, and seizures. Defendant Wellpath, Defendant Muskegon County, Defendant Dr. Natole and Defendant David Lopez, LPN, were all aware of the lack of nursing qualifications, yet continued to allow Defendant Richele Marion, EMT, and Defendant Sara Bruce, EMT, to providing qualified nursing care when neither had appropriate nursing credentials or certification and were permitted to provide care only as emergency medical technicians.

69.     Due to the wholly incompetent withdrawal tapering schedule, the insufficient prescribed tapering medication of Librium, the CIWA-Ar assessments that clearly indicated Paul Bulthouse was out of range, and the lack of mandated healthcare professional intervention given to him, his health deteriorated.

70.     On March 27, 2019, at 8:00 a.m. Defendant, Jessica Fairbanks, LPN, completed and signed a "Medical History and Physical Assessment with Mental Health" form. This medical form indicated that the "Receiving Screening" was reviewed by her. She did not check the disposition box for "Medical Monitoring for Potential Withdrawal."  She further noted that there is a history of substance abuse/ treatment for "Ativan, Klonopin and ETOH." This Medical History and Physical Assessment with Mental Health form was signed by Dr. Natole on March 29, 2019.

71.     The medication order record history records indicate the following individuals administered medication to Paul Bulthouse that was ordered by Defendant Dr. Natole and under the supervision of Defendant David Lopez, LPN, from the date of Paul Bulthouse's admission into the jail on March 22, 2019 until his death on April 4, 2019: Defendant Jessica Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Aubrey Schotts, RN, Defendant Richele Marion, EMT, Defendant Danielle Carlson, LPN, Defendant Britni Brinkman, EMT, Jeffrey Holmstrom, IC- Paramedic, Nycolle Kowalczuk, MA/LNA, and Defendant Sara Bruce, EMT.

72.     On March 29, 2019, it is documented in the progress notes that Paul Bulthouse was at last personally observed by Defendant Dr. Natole for the first time and also by Defendant Carleen Blanche, RN. Defendant Carleen Blanche, RN, documented that Paul Bulthouse was seen by the MD (Defendant Dr. Natole) due to him complaining of "numbness to arms." She further stated that he was "difficult this AM," and "asking for an 'ambulance,' reluctant to allow staff to assess him & refused meds (BP) despite c/o 'stroke symptoms.' BP high yet rechecked with MD visit. MD aware of BP resolving." Defendant Carleen Blanche, RN, was deliberately indifferent to his serious medical needs of presenting with tremor, left side numbness and/or numbness to his arms, high level of anxiety, extremely high blood pressure / hypertension, a high level of agitation, complaining of stroke symptoms, and requesting an ambulance for medical help and yet, Defendant Carleen Blanche, RN, did not seek any emergency medical assistance for Paul

Bulthouse. Defendant Carleen Blanche, RN, did not order that Paul Bulthouse be given emergency care at a hospital, she did not order subordinates to address Paul Bulthouse's serious medical needs, nor did she ask for / or prescribe a follow up plan to care for him. Defendant Carleen Blanche, RN, simply left Paul Bulthouse to further deteriorate and suffer from the severe withdrawal symptoms and seizures that progressed until they ultimately led to his death.

73.     On March 29, 2019, Defendant Dr. Natole noted in his charted evaluation that Paul Bulthouse's blood pressure was "175/113," which is dangerously high. He noted in the subjective "neuro" section of his evaluation that Paul Bulthouse was complaining of numbness to his left side. In the objective portion of his notes, Defendant Dr. Natole noted in the "neuro" section that Paul Bulthouse was experiencing weak grip bilateral, left side "tremor" and he wrote the word "factitious." Defendant Dr. Natole's final impression was charted as Paul Bulthouse only experiencing generalized anxiety disorder and hypertension. Other than noting for a follow up on "records," Defendant Dr. Natole gave no medical orders to have Paul Bulthouse be taken to an emergency care at a hospital, gave no medical orders / directives to subordinates to address Paul Bulthouse's serious medical needs nor asked for / or prescribed a follow up plan to care for him. Defendant Dr. Natole simply left Paul Bulthouse to further deteriorate and suffer from the severe withdrawal symptoms and seizures that ultimately led to his death.

74.     Defendant Dr. Natole's labeling of Paul Bulthouse's obvious symptoms and complaints as "factitious" was deliberately indifferent to his serious medical needs of presenting with tremor, left side numbness and/or numbness to his arms, high level of anxiety, extremely high blood pressure / hypertension, a high level of agitation, complaining of stroke symptoms, and requesting an ambulance for medical help. Defendant Dr. Natole's flagrant statement that Paul Bulthouse's symptoms were "factitious" implied that he was feigning his symptoms despite the fact that his symptoms were consistent with those of alcohol or benzodiazepine withdrawal,

knowing that Paul Bulthouse had been taking high doses of benzodiazepine prior to incarceration, and that he had just completed a tapering regimen. Instead of further monitoring Paul Bulthouse himself, or giving instructions to subordinates for further monitoring, Defendant Dr. Natole chose the word "factitious" to include in his report that Paul Bulthouse was faking the symptoms. Instead of giving instructions for further monitoring to determine whether he was in fact faking, Defendant Dr. Natole and Defendant Medical Personnel ignored Paul Bulthouse, and therefore his worsening condition led to his death.  This deliberate indifference is highlighted by the fact that Defendant Dr. Natole knew of Paul Bulthouse's charted medical history, his withdrawal symptoms, and the fact that two days prior, Paul Bulthouse had just completed the withdrawal tapering regiment that Defendant Dr. Natole allegedly ordered. Defendant Dr. Natole gave no medical orders to have Paul Bulthouse be taken to an emergency care at a hospital, gave no medical orders / directives to subordinates to address Paul Bulthouse's serious medical needs nor asked for / or prescribed a follow up plan to care for him. Defendant Dr. Natole simply left Paul Bulthouse to further deteriorate and suffer from the severe withdrawal symptoms and seizures that ultimately led to his death.  Dr. Natole never saw Paul Bulthouse again after his incompetent medical assessment on March 29, 2019, which was just a matter of days before Paul Bulthouse died of the very symptoms that he presented with to Defendant Dr. Natole.

75.     On March 29, 2019, Defendant Carleen Blanche, RN, spoke to a staff member in Paul Bulthouse's primary care physician's office and requested his medical records and medications list. On March 30, 2019, his primary care physician, Dr. Walkotten, faxed eight pages of his medical records to Wellpath LLC/Corrective Care Solutions at the Muskegon County Jail, indicating that as of March 19, 2019, Paul Bulthouse was prescribed 2 mg of Klonopin and 100 mg of Lopressor. There was also notation that he was being treated for high blood pressure and episodic tachycardia (rapid heartbeat). A medication log, including his current dosage of Klonopin

and Lopressor, was attached.  The medication log indicated that he had been prescribed Klonopin and Lopressor since 2016. Even with this knowledge of Paul Bulthouse's medical and long-term prescription history of Klonopin, Defendant Carleen Blanch, RN, Defendant David Lopez, LPN, and Defendant Dr. Natole continued to ignore his serious medical needs by being deliberately indifferent. They did not offer him emergency medical treatment and did not even order a plan to treat his withdrawal symptoms. They did not reinstate the withdrawal tapering schedule nor order a new withdrawal medication regimen.

76.     On March 31, 2019, going into the early morning hours of April 1, 2019, Defendant Deputy Patterson observed Paul Bulthouse making comments that led him to believe "he was hallucinating." Defendant Deputy Patterson documented that "while I was assisting the nurse on 3/31/19 he had mentioned there was a man getting into the bag. I looked back and had seen nothing that resembled someone getting into a bag." Upon information and belief, the only on-duty nurses that worked that day were Defendant Aubrey Schotts, RN, and Defendant Ashleigh Severance, LPN. Later during that same shift, Defendant Deputy Patterson noticed that Paul. Bulthouse's hallucinations and vocal outbursts were becoming more frequent and disturbing the other inmates. Paul Bulthouse was then moved to a private cell by Defendant Deputy Patterson, Defendant Sgt. Vanderlaan and other deputies at approximately 5:09 a.m. on April 1, 2019, where he continued to have vocal outbursts. Defendant Deputy Patterson noted in his report that he was "advised" "that Bulthouse was going through withdrawal of alcohol. Hallucinations and conversations with nobody present are common."

77.     On April 1, 2109, as stated above, at approximately 5:09 a.m. Defendant Sgt. Vanderlaan noted that he observed Paul Bulthouse wearing a suicide prevention gown and causing a disturbance in his cell by "pacing back and forth and striking the door." Due to his diminished mental capacity resulting from his withdrawal-related psychosis and seizures, Paul Bulthouse was

clearly unable to understand or respond rationally to commands from jail personnel. Defendant Sgt. Vanderlaan and the other deputies removed Paul Bulthouse from the shared cell to a private cell where he could be monitored. The jail video recordings produced by Muskegon County clearly show Paul Bulthouse exhibiting signs of delirium and auditory and visual hallucinations while in his holding cell. The incident when he leaves his cell, in what is declared an "attempted escape" during the medicine distribution by Defendant Richele Marion, EMT, is captured on video recordings from both his holding cell camera and the hallway camera where he was tackled.  After being tackled, Paul Bulthouse subsequently had a prolonged seizure with convulsions as he was lying on the ground.

78.     On April 1, 2019, Defendant Richele Marion, EMT, noted that while she was administering the passing of medication, she observed Paul Bulthouse exit his cell and be taken down to the ground by deputies. Defendant Richele Marion, EMT, observed and noted that Paul Bulthouse was breathing rapidly at 26 times a minute and when taken down to the ground he was breathing at 22 times a minute. She stated that "once they gained control, inmate began to shake. Airway was patent, and he was breathing approx. 22/min." She documented that she observed Paul Bulthouse "shake" on the ground and that he was non-verbal. Even though she was observing Paul Bulthouse experiencing a seizure, she chose not to take his vitals indicting, "No injuries seen or reported." She also chose not to give him his evening medications. She wrote that she observed Paul Bulthouse at 9:20 p.m. "now standing up, walking around his cell naked. All shackles were removed and he seems to be moving around fine. No obvious signs of trauma seen." At 6:18 a.m. on April 2, 2019, Defendant Richele Marion, EMT, observed and noted that she "checked on inmate Bulthouse at 0345 and again at 0500. At both times, he was standing upright just inside the door, facing the door. He is breathing approx. 18/min NL. Inmate has been monitored via camera all night. He has remained standing most of this time. Will advise next shift."  Defendant Richele

Marion, EMT, ignored Paul Bulthouse's serious medical needs as she did not call 911 to have him taken to emergency care at a hospital, gave no medical orders / directives to anybody including colleagues, subordinates or supervisors to address Paul Bulthouse's serious medical needs nor asked for / or prescribed a follow up plan to care for him. This is despite her knowledge of the seizure, his high scoring on the CIWA-Ar assessments that she previously completed and him not receiving his evening medications. Defendant Richele Marion, EMT, simply left Paul Bulthouse to further deteriorate and suffer from the severe withdrawal symptoms and seizures that ultimately led to his death.

79.     On April 1, 2019, during the event that was considered an "attempted escape," Defendant Sgt. Vanderlaan, who was the on-duty supervising officer, noticed that when Paul Bulthouse was on the ground he was "twitching his left leg" and then "flailing about." Defendant Sgt. Vanderlaan stated, "Believing him to be having a seizure, I lifted BULTHOUSE to keep him from injuring himself by striking his head on the ground, and then instructed Deputy Graviano to place the suicide prevention blanket beneath his head." Paul Bulthouse was then placed in leg shackles and belly chains to be dragged to his cell. Defendant Sgt. Vanderlaan purported in a report (later drafted on April 9, 2019), to have had a conversation with Defendant Richele Marion, EMT, after the "attempted escape." Defendant Sgt. Vanderlaan's report purports that, "Once the door was secured, I spoke to Richele Marion the on duty medical staff that had been in the receiving during the incident. I asked if she believed the apparent seizure to be legitimate, she advised me that she did not feel that it was." The video depicts Paul Bulthouse experiencing a severe multiple-minute prolonged seizure, namely status epilepticus, while lying on the ground in the jail hallway. He was not treated for this emergency medical condition by the Defendant Medical Personnel who were deliberately indifferent to his serious medical needs. Defendant Richele Marion, EMT's statement that Paul Bulthouse's seizure /symptoms were "not legitimate" implied that he was

feigning symptoms despite the fact that Defendant Richele Marion, EMT, knew the seizures and his symptoms were consistent with those of benzodiazepine withdrawal, that she knew Paul Bulthouse had been taking substantial amounts of benzodiazepines prior to incarceration and that he had just completed a withdrawal tapering regimen, and had participated in his CIWA-Ar assessment scoring. Instead of further monitoring Paul Bulthouse herself, or giving instructions to further monitor him to determine whether he was in fact faking, Defendant Richele Marion, EMT, chose to conclude and state that Paul Bulthouse was faking the seizure. Defendant Richele Marion, EMT, and Defendant Medical Personnel chose to ignore Paul Bulthouse, and therefore his worsening condition led to his death. Defendant Richele Marion, EMT, ignored Paul Bulthouse's serious medical needs as she did not call 911 to have him taken to emergency care at a hospital, gave no medical orders / directives to anybody including colleagues, subordinates or supervisors to address Paul Bulthouse's serious medical needs nor asked for / or prescribed a follow up plan to care for him.

80.    The "attempted escape" incident occurring on April 1, 2019, was also observed by Defendant Deputy Miller as she was the individual in the cell with Defendant Richele Marion, EMT. Defendant Deputy Miller observed Paul Bulthouse experience the prolonged seizure in the hallway and did nothing to aid him as he experienced this serious medical need. Defendant Deputy Miller ignored Paul Bulthouse's serious medical needs as she did not call 911 to have him taken to emergency care at a hospital, gave no medical orders / directives to anybody including colleagues, subordinates or supervisors to address Paul Bulthouse's serious medical needs nor asked for / or prescribed a follow up plan to care for him.

81.    The "attempted escape" incident occurring on April 1, 2019, was also observed by Defendant Deputy Wall and Defendant Deputy Graviano as each of them used force to take Paul Bulthouse down to the ground in the hallway and put him into handcuffs, with the later application

of extremely tight belly chains and leg shackles. Both Defendant Deputy Wall and Defendant Deputy Graviano observed Paul Bulthouse experiencing a prolonged seizure in the hallway and did nothing to aid him as he experienced this serious medical need. Both Defendant Deputy Wall and Defendant Deputy Graviano ignored Paul Bulthouse's serious medical needs as neither called 911 to have him taken to emergency care at a hospital, gave no medical orders / directives to anybody including colleagues, subordinates or supervisors to address his serious medical needs nor asked for / or prescribed a follow up plan to care for him.

82.     During the "attempted escape" incident, at the direction of Defendant Sgt. Vanderlaan and Defendant Deputy Olson placed leg shackles on Paul Bulthouse. This use of force occurred while Defendant Sgt. Vanderlaan, Defendant Deputy Graviano and Defendant Deputy Wall were applying the belly chains as Paul Bulthouse was having a seizure. The belly chains were applied in such a tight manner that you can see the markings on Paul Bulthouse's body after he is dragged into his cell by Defendant Deputy Olson, Defendant Sgt. Vanderlaan, Defendant Deputy Graviano and Defendant Deputy Wall amounting to a use of excessive force. Paul Bulthouse was dragged on the floor and back into his cell while in overly tight belly chains, handcuffs and leg shackles violating his right to be free from the unreasonable use of force. The video recording depicts Paul Bulthouse being left on the floor of his cell, naked, covered in paper rubbish from the wet ground, face down, with his face in the sewage drain while he continued to have seizures until he passed out. Due to the excessive use of force of the metal restraints he was barely able to move to a prone position. He clearly suffers pain and mental anguish due to being left in this inhumane condition. Defendant Deputy Olson, Defendant Sgt. Vanderlaan, Defendant Deputy Graviano and Defendant Deputy Wall were deliberately indifferent to Paul Bulthouse's serious medical needs as they left him to die in his cell shackled while observing a prolonged seizure.

83.     On April 1, 2019, Defendant Deputy Greve and Defendant Deputy Perri were working in the master control room, assigned to video surveillance, and were able to observe the live video surveillance of Paul Bulthouse's alleged "escape" and the actions of the deputies during the takedown. Defendant Deputy Greve stated that she "… could see Bulthouse starting to shake as if he was having a seizure. I was made aware after the fact that this was a seizure that was faked by Bulthouse." Defendant Sgt. Vanderlaan indicated in his report that due to Paul Bulthouse having the seizure in the hallway, he specifically told Defendant Deputy Greve and Defendant Deputy Perri "to monitor BULTHOUSE via the camera system."   Both Defendant Deputy Greve and Defendant Deputy Perri deliberately ignored Paul Bulthouse's serious medical needs as they observed him suffering from seizures, extreme / deadly withdrawal symptoms during the incident on April 1, 2019, and continued seizures while he was in his cell lying face down with too tight belly chains, handcuffs and leg shackles while his face was in the sewer drain. Neither called 911 to have him taken to emergency care at a hospital or sought medical attention for him while he suffered in the inhumane conditions of confinement.

84.     As a result of the alleged "attempted escape" incident, Paul Bulthouse was charged with various new felony offenses, such as assault of prison employees and escape, whereupon he was held in custody as a pretrial detainee on the new arrest, as he waited for arraignment on the new felony charges. He once again was unable to post a bond to free him from the torturous jail.

85.     Although a video preservation demand was immediately and timely submitted to Defendant Muskegon County, along with Freedom of Information Requests, the video recordings of Paul Bulthouse's cell from April 1, 2019, until the date of his death on April 4, 2019, were not tendered. Of note is that the video recordings produced by Defendant Muskegon County beginning at midnight on April 4, 2019, are playable in a software format that allows a viewer to watch two camera feeds (jail cell and booking room area) simultaneously with matching time stamps. For

example, a viewer can see Defendant Deputies at a central booking area workstation located directly outside of Paul Bulthouse's cell, where Defendant Deputies watch a live video feed of the interior of Paul Bulthouse's cell on computer monitor(s). The video player allows for simultaneous viewing of two different locations (cell and booking room area) at the same time. The viewer of the recording can simultaneously watch the interior of Paul Bulthouse's cell, depicting him having countless seizures, while also watching the actions / inactions of the Defendant Deputies in the booking area while he is having the seizures.

86.     Despite numerous Freedom of Information Requests and requests to preserve, Defendant Muskegon County and Defendant Wellpath have not provided video recordings, jail reports, or medical reports indicating any monitoring whatsoever on April 2, 2019, and April 3, 2019.

87.     Paul Bulthouse's condition worsened significantly from the time on April 1, 2019, that Defendant Richele Marion, EMT, made her observations of him after his "escape attempt" through the early hours of April 4, 2019. Paul Bulthouse was exhibiting new and alarming symptoms and a worsening condition throughout days which undoubtedly required Defendant Deputies to re-alert medical staff. Defendant Deputies chose not to re-alert medical stuff during this time period and therefore, deliberately indifferent to his serious medical needs as they ignored the obvious signs of the medical emergency of status epilepticus and severe withdrawal symptoms by not seeking medical care and re-alerting the medical staff to treat him.

88.     Up to and including April 4, 2019, Paul Bulthouse's status and health conditions were still significantly worsening, and he continued to exhibit severe withdrawal symptoms and seizures. However, Defendant Dr. Natole still did not start a new withdrawal regimen because he chose not to reexamine or order a follow up evaluation with Paul Bulthouse after his "exam" on March 29, 2019. Dr. Natole was deliberately indifferent as he failed to supervise his subordinates

by not communicating with them or giving them a medical plan to care for Paul Bulthouse's serious medical needs. All Defendants named in this complaint continued to watch Paul Bulthouse experience bizarre behavior with hallucinations, agitation, severe withdrawal symptoms, serious medical needs such as seizures, and denied his requests to go to the hospital.  As Paul Bulthouse's severe withdrawal symptoms continued, his seizures / status epilepticus continued more rapidly while he became even more dehydrated and malnourished in his cell. Paul Bulthouse had now lost twelve pounds in thirteen days as his body began to shut down due to the lack of medical care.

89.    During the evening shift of April 3-4, 2019, Defendant Deputy Greve noted that during her briefing, "Deputies had mentioned that Bulthouse was continuing to fake seizures and medical was aware of this. I advise [sic] those Deputies that he had started faking seizures on 04/01/2019."

90.    During the evening shift of April 3, 2019, until 6:30 a.m. of April 4, 2019, Defendant Sgt. Vanderlaan was the supervising officer. During that shift, Defendant Deputy Baker was assigned to master control which provided him with direct live video surveillance into Paul Bulthouse's cell and booking area via a computer monitor(s) in the master control room. Defendant Deputy Greve, Defendant Deputy Patterson and Defendant Deputy Lane were assigned to the booking area where they had direct personal visual observation into Paul Bulthouse's HD13 cell via the window on his cell door, as well as direct video camera surveillance into the cell via computer monitor(s) at their desk. The booking area consists of a square workspace area with computers and desks in the middle of an open room and the jail cells are located within eyesight of the workspace around the perimeter of the room.  Defendant Deputy Baker, Defendant Deputy Greve, Defendant Deputy Patterson and Defendant Deputy Lane were responsible for maintaining constant watch on Paul Bulthouse due to his jail classification and medical condition.  At times they would turn off the live video feed displayed on the monitor that was showing Paul Bulthouse's

cell and/or utilize the computer monitor for other purposes, so that the jail cell video feeds were hidden. Defendant Deputy Baker, Defendant Deputy Greve, Defendant Deputy Patterson and Defendant Deputy Lane were deliberately indifferent to Paul Bulthouse's serious medical needs, by not reporting nor offering emergency medical help as he suffered from status epilepticus, where he violently shook and contorted his body during a minimum of 20 prolonged seizures while he lay in his own puddle of urine for their entire April 3-4, 2019 overnight work shift. The seizures were obvious in person, especially to Defendant Deputy Patterson who at 2:54 a.m. stared directly at Paul Bulthouse through the cell window while he had a prolonged seizure, yet Defendant Deputy Patterson simply kept walking down the hallway, showing deliberate indifference to Paul Bulthouse's serious medical needs.  The constant seizures were obvious via the crystal-clear video images streaming live to the monitor(s) being viewed by Defendant Sgt. Vanderlaan, Defendant Deputy Baker, Defendant Deputy Greve, Defendant Deputy Patterson and Defendant Deputy Lane for their entire evening shift.

91.    Defendant Deputy Greve noted in her report that on April 4, 2019, she advised Defendant Deputy Patterson as to her belief that Paul Bulthouse was exhibiting withdrawal symptoms despite his completion of withdrawal checks "a few days prior." Despite this belief and affirmation, Defendant Deputy Greve and Defendant Deputy Patterson deliberately denied Paul Bulthouse medical care for his status epilepticus.

92.    Defendant Deputy Baker, who was delegated to the master control room, had a constant live video stream of Paul Bulthouse's cell and booking room area, and was deliberately indifferent for not seeking emergency medical care for Paul Bulthouse for each and every seizure he sustained on April 3, 2019, through his death on April 4, 2019.

93.    Defendant Aubrey Schotts, RN, and Defendant Sara Bruce, EMT, were the on-duty medical personnel during the evening shift on April 3-4, 2019. Neither offered emergency medical

care as Paul Bulthouse was clearly exhibiting status epilepticus as his body convulsed at various times during the six hours of video provided. He also exhibited severe withdrawal symptoms plainly during their in-person viewing and examinations of him during their shifts. They were deliberately indifferent to his serious medical needs as they ignored the obvious signs of the medical emergency of status epilepticus and severe withdrawal symptoms by not seeking emergency medical care to treat him.

94.     The video from April 4, 2019, illustrates Paul Bulthouse being subjected to the use of excessive force by Defendant Deputy Greve, Defendant Deputy Patterson, Defendant Deputy Lane and Supervisor Sgt. Vanderlaan in that he was constrained in belly chains that were connected to handcuffs in an overly tight manner while he was housed in his cell HD13. One can clearly see in the video that his feet and hands were turning purple due to this unreasonable use of force. Moreover, the inhumane metal restraints on his body would not allow for the involuntary contortions of Paul Bulthouse's arms and hands that were occurring with great force during the status epilepticus. This inhumane condition of confinement was objectively unreasonable, caused extreme and unnecessary pain and suffering and physical injuries as indicated in the postmortem report.

95.     Defendant Deputy Patterson and Defendant Deputy Lane decided to have Paul Bulthouse's cell cleaned and walked him to cell HD5 where he was examined by Defendant Aubrey Schotts, RN, at approximately 1:18 a.m. on April 4, 2019. Up until this point, the video shows Paul Bulthouse experiencing severe withdrawal symptoms and numerous episodes of status epilepticus in his HD13 cell while constrained with the too tight belly chains and handcuffs. The video now shows Paul Bulthouse having numerous seizures in HD5 where he was left unattended (although Defendant Deputy Patterson was looking at the live video feed of HD5 on the computer monitor). Due to his severe medical condition and continually deteriorating condition, the video

shows Paul Bulthouse falling very hard into the cement wall of the HD5 cell while waiting for the nurse to examine him.  At one point, Paul Bulthouse is having a massive seizure while Defendant Aubrey Schotts, RN, is talking to Defendant Deputy Patterson in the booking area with a direct line of sight to the monitor showing HD5. At approximately 1:29 a.m., the video depicts Defendant Aubrey Schotts, RN, socializing and laughing uncontrollably with the deputies at the booking area workstation and simultaneously, Paul Bulthouse is violently shaking and contorting his body as he has yet another massive seizure. Defendant Aubrey Schotts, RN, Defendant Deputy Patterson, Defendant Deputy Lane and Defendant Deputy Greve all continue to socialize while the live video feed of the cell on the monitor is clearly visible. In fact, the gleeful socialization extended to the point where Defendant Aubrey Schotts, RN, peered over the desk and entered the interior of the workstation area where she was even closer to the monitor showing Paul Bulthouse.

96.     The video depicts Paul Bulthouse, who had just experienced numerous seizures, lying on the cement bench in HD5 waiting for Defendant Aubrey Schotts, RN, to enter the cell and examine him. Defendant Deputy Lane and Defendant Deputy Patterson enter HD5. While still lying down in the belly chains and handcuffs, Paul Bulthouse was covered by the suicide gown and was restrained by Defendant Deputy Lane's hip and body weight until Defendant Aubrey Schotts, RN, enters the cell for the second time. The video then depicts Paul Bulthouse having a seizure while lying on the concrete bench where his uncovered foot is exposed and can be seen clearly shaking as it always does when he experiences massive seizures. Defendant Deputy Lane, Defendant Deputy Patterson and Defendant Aubrey Schotts, RN, ignore this in-person episode of seizure activity and were deliberately indifferent to Paul Bulthouse's serious medical needs.

97.     Although the physical manifestations of Paul Bulthouse's severe withdrawal symptoms were present as he was in acute distress and evidence of seizures were readily apparent to anyone watching the video of the event, Defendant Aubrey Schotts, RN, noted that his vital

signs were stable. She noted that the belly chains were loosened by Defendant Deputy Lane and his wrists "are red and swollen at the sites from the belly chains and cuffs." After the examination, Paul Bulthouse is stood up by Defendant Deputy Lane in the presence of Defendant Aubrey Schotts, RN, and Defendant Deputy Patterson, and he is escorted to the doorway of the cell where he has absolutely no balance and falls into the cement wall of HD5. In fact, Defendant Aubrey Schotts, RN, raises her hands to protect herself from being fallen into by Paul Bulthouse.

98.     At about 1:44 a.m., Paul Bulthouse returns to HD13 where his fatal night would continue as everyone who was supposed to be monitoring him continued to ignore his need for emergency medical attention. However, as a courtesy Defendant Deputy Lane and Defendant Deputy Patterson decided to end their cruel and unusual punishment and remove the overly tight belly chains and handcuffs. The contusions on Paul Bulthouse's arms and torso are visible from the camera and clearly show how excessively and grotesquely tight the metal was wrapped around his wrists and torso. While lying on the cement floor he shakes and experiences involuntary movement of his limbs. His eyes continue to twitch uncontrollably, an indication of non-convulsive status epilepticus.

99.     It is purported in a report (later drafted on April 9, 2019) by Defendant Sgt. Vanderlaan that Defendant Sgt. Vanderlaan met with Defendant Aubrey Schotts, RN, in the master control room after her April 4, 2019, evaluation of Paul Bulthouse due to Defendant Sgt. Vanderlaan's observations of Paul Bulthouse's behavior such as spontaneous utterances and clenching his fists as well as his observations of Paul Bulthouse as he was lying on the bench in HD5. Defendant Aubrey Schotts, RN, allegedly stated to Defendant Sgt. Vanderlaan in the master control room that Paul Bulthouse is a longtime alcohol abuser, his ammonia are likely high causing apparent tense muscles and dehydration. Allegedly when asked by Defendant Sgt. Vanderlaan if Paul Bulthouse needed to be transported to the hospital, Defendant Aubrey Schotts, RN, said he

did not need to be transported and they would monitor him at the jail. Based on this purported conversation, it is clear that Defendant Aubrey Schotts, RN, and Defendant Sgt. Vanderlaan were deliberately indifferent to Paul Bulthouse's serious medical needs.

100. At about 1:59 a.m. and at 2:02:30 a.m. Paul Bulthouse has a seizure. His body contorts and he violently shakes. Defendant Deputy Greve and Defendant Deputy Patterson are both in direct sight of the live feed video monitor and do nothing to assist Paul Bulthouse during this seizure.

101. At 2:02:30 Paul Bulthouse has another seizure. His body contorts and he violently shakes. Defendant Deputy Greve, Defendant Deputy Patterson and Defendant Deputy Lane are in direct sight of the live feed video monitor and do nothing to assist Paul Bulthouse during this seizure.

102. At 2:27:56 a.m., Paul Bulthouse has a massive seizure where his body contorts and experiences violent convulsions while Defendant Deputy Patterson and Defendant Deputy Greve watch the live video feed on the monitor. The video depicts Defendant Deputy Patterson and Defendant Deputy Greve watching Paul Bulthouse have a violent seizure on the monitor for nearly a minute. Defendant Deputy Patterson and Defendant Deputy Greve do nothing to assist or rescue Paul Bulthouse after this episode of being deliberately indifferent to his serious medical need even though they watch the seizure on the monitor.

103. The video recording depicts that at 2:36:44 a.m., Paul Bulthouse has yet another massive seizure where he contorts his body experiencing violent convulsions while Defendant Deputy Patterson watches the live video feed on his monitor. Defendant Deputy Patterson is seen starring at Paul Bulthouse convulsing and calls over Defendant Deputy Greve so that they can watch together. They point at Paul Bulthouse's image on the screen and even enlarge the onscreen window to maximize the view of him having his seizure. They watch this agony together at 2:37:10

a.m. for about 30 seconds until the seizure ends. Defendant Deputy Patterson and Defendant Deputy Greve once again do nothing to medically assist or rescue Paul Bulthouse and are deliberately indifferent to his serious medical needs.

104. At approximately 2:54 a.m., the video depicts Defendant Deputy Patterson leave his workstation, walk to Paul Bulthouse's cell and stare in at him through the cell window while he was having a major prolonged seizure. After watching Paul Bulthouse shake uncontrollably and contort unnaturally, Defendant Deputy Patterson decided to simply turn his back and walk down the hallway once again being deliberately indifferent to Paul Bulthouse's serious medical need. He does this despite the additional numerous seizures that he personally observed on the monitor. He summons no help.

105. At about 3:05:40 a.m., Paul Bulthouse had yet another massive seizure. While Defendant Patterson made his rounds, the video this time depicts Defendant Deputy Lane staring at the monitor watching Paul Bulthouse violently convulse from 3:05:53 a.m. until 3:06:07 a.m. Deputy Patterson returns to the comfort of his chair and settles into it to watch Paul Bulthouse contort while having the seizure for nearly over a minute. Defendant Deputy Patterson again chose to not seek medical attention or call 911 for Paul Bulthouse, but rather he decided to play with his cellular phone scrolling thru screens until his supervisor, Defendant Sgt. Vanderlaan approached the workstation. Defendant Deputy Lane, like Defendant Deputy Patterson, decided to do nothing to medically assist Paul Bulthouse and chose to continue to shuffle and organize his papers. Both Defendant Deputy Patterson and Defendant Deputy Lane, were deliberately indifferent to Paul Bulthouse's serious medical needs.

106. Defendant Sgt. Vanderlaan was the on-duty commanding officer and decided to supervise his subordinates by standing at the workstation of Defendant Deputy Greve, Defendant Deputy Patterson and Defendant Deputy Lane from 3:09 a.m. until 3:40 a.m. Defendants Sgt.

Vanderlaan, Defendant Deputy Greve, Defendant Deputy Patterson, Defendant Deputy Lane and Unknown Defendant Deputy converse, laugh and share snacks for the nearly 40 minute social gathering while ignoring the multiple seizures that Paul Bulthouse experiences back to back in his cell which were visible to the deputies on the live video feed monitor. While they ate snacks, laughed, and spun around in their chairs, Paul Bulthouse was involuntarily contorting his arms and hands and his legs shook violently with convulsions. Meanwhile, the deputies continued to either watch the monitor depicting Paul Bulthouse's serious medical condition unfold in front of them yet again, ignored the monitor by not watching it, or allowed the monitor to be unmanned while Defendant Deputy Patterson gathered shoes. Defendant Sgt. Vanderlaan observed first-hand his subordinates, Defendant Deputy Patterson, Defendant Deputy Greve, and Defendant Deputy Lane, and Unknown Defendant Deputy failing to monitor, observe and check in on Paul Bulthouse as his conditions deteriorated significantly and as alarming changes and symptoms occurred to Paul Bulthouse. Defendant, Sgt. Vanderlaan as the supervisor once again failed to obtain medical help for Paul Bulthouse during this nearly 40-minute social gathering that he supervised as he was deliberately indifferent to the serious medical needs. Moreover, Defendant Deputy Greve, Defendant Deputy Patterson, Defendant Deputy Lane and Unknown Deputy Defendant were deliberately indifferent yet again during this festive time.

107.    At about 3:46 a.m. a new social gathering began at Defendant Deputy Greve, Patterson and Lane's workstation. Unknown Defendant Deputies arrive and once again all begin to converse and laugh while some sit on the desk or comfortably lean on the counters. However, this time they are joined by Defendant Sara Bruce, EMT, who is doing her rounds with the new jailers, however, she does not medically evaluate or check in on Paul Bulthouse one single time during her rounds. The monitor then goes unmanned yet again while Defendant Deputy Patterson spins in his chair, Deputy Greve shuffles paper, and Deputy Lane assists on the rounds.

108.   Paul Bulthouse continued to have multiple violent seizures / status epilepticus while Defendant Deputy Greve, Defendant Deputy Patterson, Defendant Deputy Lane, Unknown Deputy Defendants, and Defendant Sara Bruce, EMT, continued to deliberately ignore his serious medical needs. They chose to physically ignore Paul Bulthouse, leave the monitor unmanned due to socialization or to complete administrative functions during crucial times where Paul Bulthouse was dying. Paul had no less than 8 massive seizures (Approximately: 3:48 a.m., 3:53 a.m., 4:05 a.m., 4:17 a.m., 4:30 a.m., 4:45 a.m., 4:57 a.m., 5:00 a.m., 5:15 a.m., and 5:30 a.m.) between the hours of 3:45 a.m. and approximately 5:35 a.m. which is the time of his last breath on the video. Between 3:45 a.m. and 5:35 a.m., Paul Bulthouse continually suffered from seizure activity with convulsions contorting his arms and hands in while he shook violently as his mouth opened with spit dripping. He would finally die of status epilepticus while lying in a pool of urine on a cement floor.

109.   Upon realizing Paul Bulthouse was dead at 6:15 a.m., Defendant Sara Bruce, EMT, would finally offer her much needed medical assistance by covering the dead body of Paul Bulthouse with a blanket. Rigor mortis had already set in Paul Bulthouse's body.

110.   At about 6:10 a.m., Defendant Deputy Baker would emerge from his master control room where he was previously able to watch Paul Bulthouse experience status epilepticus via his live feed for over 6 hours. He finally offered his much-needed assistance by conversing with Defendant Deputy Greve about the "cupcakes" that he had in his car, then handing Defendant Sara Bruce, EMT, a blanket to cover the dead body. His final act of heroism was looking out for the well-being of the responding Pro Meds (emergency medical technicians) advising them to take caution in the HD13 cell as there was "urine on the floor and the floor is slippery." Defendant Deputy Patterson was also compelled to finally act as he decided to go to the master control room and immediately review the camera recordings of HD13 to ensure that there was "no foul play" in

Paul Bulthouse's cell. However, Defendant Deputy Patterson reviewed the wrong camera recordings as he needed to review the recordings of the booking area workstation where he and his colleagues can be seen socializing for the entire night and doing nothing to assist Paul Bulthouse.

111.    From approximately 1:44 a.m. when Paul Bulthouse was returned to his cleaned out cell, until his body was found dead at 6:15 a.m., no deputies (other than Defendant Deputy Lane, who left cereal and milk on the windowsill at approximately 4:20 a.m.) or medical personnel would enter Paul Bulthouse's cell to communicate or check in on him.

112.    Defendant Deputies observed Defendant Medical Personnel's deliberate indifference to Paul Bulthouse's serious medical condition over a period of many hours and/or days and therefore, Defendant Deputies chose themselves to be deliberately indifferent to Paul Bulthouse's serious medical needs by delaying any attempts to seek additional help.

113.    The postmortem examination report indicated the cause of death to be status epilepticus. The forensic pathologist noted in her examination and investigative findings under the cause of death of status epilepticus: "Video of multiple episodes of seizure activity without obvious recovery over at least three hours prior to being found unresponsive in jail cell, per review of law enforcement video."

114.    The postmortem examination report also documented multiple external injuries to the body of Paul Bulthouse. Both sides of his torso had red-purple discolorations and contusions to his hips. There were multiple irregular blue-purple contusions to his right arm and multiple red-brown abrasions and scattered pink-purple discoloration to his right arm. There were approximately five pink circular to irregular contusions to the right arm and elbow. He suffered from contusions on his right forearm. There was red-brown abrasion and a blue-purple contusion to his right wrist. His left arm exhibited various colored contusions and abrasions. His left forearm and wrist showed abrasions as well as his hand had blue-purple contusions.  The right thigh had

42

blue-purple contusions as well as red-purple contusions to his right knee and leg. His left knee also had contusion and abrasion.

115.     Pleading in the alternative, upon information and belief, Defendant Muskegon County individual Defendants, such as Defendant Sgt. Vanderlaan, falsified their reports when stating that they asked Defendant Wellpath medical personnel, i.e. Defendant Richele Marion, EMT, and /or Defendant Aubrey Schotts, RN, medical opinions such as whether the seizures that they all personally observed were fake and whether Paul Bulthouse should be taken to a hospital all in an attempt to deflect liability from their own deliberate indifference. This sham is exemplified by the fact that the falsified reports by Defendant Sgt. Vanderlaan were drafted on April 9, 2019, multiple days after the death of Paul Bulthouse to coincide with the internal investigation of the Muskegon County Sheriff's Department that initially cleared any wrongdoing. Defendant Sgt. Vanderlaan only drafted his report alleging these "discussions" with medical personnel after he was asked to document his personal involvement with inmate Paul Bulthouse.

116.     Some jail calls made by Paul Bulthouse were produced. A review of those calls indicates that on March 24, 2019, Paul Bulthouse reported to his grandmother that the jail has him doing alcohol rehabilitation, that the jail is not allowing him to take his medications, specifically Klonopin, and as a result he is starting to "snap" and "break again." Paul Bulthouse stated that he is getting sick because the conditions are horrible in the jail. He also complained that he was being mistreated by the "late night sheriff" as they refused him the use of the phone. He stated that he was told to "shut up and sit down." He further told his grandmother that the deputy told him specifically to not ask for "meds while he is being detained" and that they don't "serve meds in jail."

117.     On March 26, 2019, Paul Bulthouse called his grandmother and stated in summary that they are going to make him stay in jail without receiving his prescribed medications that he is

supposed to be receiving. In summary, he further stated that the jail conditions are very bad, that he had a mental breakdown and his suicidal ideation has greatly increased. Paul Bulthouse explained that he is not receiving his Klonopin and that they will not give him Klonopin. Paul Bulthouse explained that he needs his medicine that he is prescribed, that he is getting very sick due to the conditions of the jail and that he will need to go the hospital. He stated that he will "die in jail."  On March 29, 2019, Paul Bulthouse stated in the phone conversation to his grandmother that he needed an ambulance and that had to go to the hospital which is the exact requests he made to Defendant Carleen Blanch, RN, at his medical evaluation later that same morning.

118.    As depicted in the video, cell HD13 is in plain view of the booking area where the deputies can see into the cell and can observe the live cell feeds on the monitor[s]. For multiple days, Paul Bulthouse was detained in HD13 which is one of the front facing holding cells located across from the booking area. All of his daily activities could be observed including if he ate or drank. Through the large window in his observation holding cell, Paul Bulthouse was plainly visible to all, including those walking by his cell, and the camera in his cell displayed the entire room. His dire condition—with regard to both his mental and physical health—was obvious. Every single deputy, supervising deputy, or medical personnel who was in the booking area including all Defendants named in this complaint (with the possible exception of Defendant Sheriff Poulin and Defendant Lt. Burns), observed Paul Bulthouse and saw that he was obviously in need of immediate medical attention. It was absolutely clear to all of the individual defendants that he needed to be taken to a hospital or to an acute care facility.

119.    By way of example, all Defendants named in this complaint (with the possible exception of Defendant Sheriff Poulin and Defendant Lt. Burns), including Defendant Medical Personnel and Defendant Deputies, could see that Paul Bulthouse was rapidly deteriorating as he was not eating his meals or drinking sufficient fluids as he lost twelve pounds in thirteen days. He

was plainly suffering from malnutrition, extreme calorie deficit, and dehydration. His injuries, contusions and markings on his body from the excessive force used on him with the metal belly chains, handcuffs and leg shackles were clearly on his arms, wrists, torso and legs. The degree of malnourishment and dehydration from which Paul Bulthouse was suffering constituted an obvious and objectively serious medical need, and the individual defendants were deliberately indifferent to that need.

120.    All Defendants named in this complaint (with the possible exception of Defendant Sheriff Poulin and Defendant Lt. Burns), including Defendant Medical Personnel and Defendant Deputies, ignored Paul Bulthouse's request for Klonopin, but they later observed him acting bizarre, experiencing visual and auditory hallucinations, yelling, agitated, saying spontaneous bizarre utterances, talking to himself, and speaking nonsensically about events that did not take place. They saw that he was disoriented. They saw his convulsions. When Paul Bulthouse was booked in the jail, he was alert and oriented as to time and place asking for his Klonopin to be given to him as he clearly knew the dangers of not taking his prescribed benzodiazepine medication; and a mere week later he was experiencing confusion and complete delirium. For days on end, defendants watched him go without sleep and observed him regularly pacing in his cell, rolling around on the floor and yelling, and otherwise exhibiting signs of extreme restlessness and anxiety. They saw him naked convulsing on the cold floor. They knew he was actively hallucinating and delusional. Paul Bulthouse's psychotic break from reality was so profound that he allegedly tried to escape from his cell to run to safety into a hallway were he then had a seizure in plain view of the deputies and medical personnel. He was often heard yelling and causing a commotion due to his psychosis by the other inmates. Paul Bulthouse's deteriorating mental health symptoms, physical withdrawal symptoms, and seizures constituted an objectively serious medical need, and all Defendants were deliberately indifferent to that need.

121.    All Defendants named in this complaint (with the possible exception of Defendant Sheriff Poulin and Defendant Lt. Burns), including Defendant Medical Personnel and Defendant Deputies, could also see that Paul Bulthouse was suffering from delirium. They also saw him sweating, twitching, trembling, and lying on the floor in his own urine while uncontrollably shaking and, suffering from repeated seizures: symptoms of non-convulsive and convulsive status epilepticus. These symptoms constituted an obvious and objectively serious medical need, and the individual defendants were deliberately indifferent to that need.

122.    All Defendants named in this complaint, including Defendant Medical Personnel and Defendant Deputies, acted with deliberate indifference to Paul Bulthouse's serious medical needs and subjected him to inhumane conditions of confinement that amounted to punishment. All Defendant Deputies acted with deliberate indifference to Paul Bulthouse's serious medical needs, used objectively unreasonable force on him, and subjected him to inhumane conditions of confinement that amounted to punishment. All acts and omissions committed by all of the individual defendants named herein were committed with malice or with reckless disregard for Paul Bulthouse's constitutional rights.

123.    As a result of the allegations contained in this complaint, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns, in their official capacity—are liable under 42 U.S.C. § 1983 for maintaining unconstitutional policies and customs that resulted in the violation of Paul Bulthouse's clearly established Fourteenth Amendment right to adequate medical care and to humane conditions of confinement, as well as his clearly established Fourteenth Amendment right to be free from objectively unreasonable force. As a direct and proximate result of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns'

unconstitutional acts and omissions- in their official capacity, Paul Bulthouse experienced extreme physical pain and suffering, severe mental anguish, and death.

124.    As a result of the allegations contained in this complaint, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, in their official capacity, are liable under 42 U.S.C. § 1983 for maintaining unconstitutional policies and customs that resulted in the violation of Paul Bulthouse's clearly established Fourteenth Amendment right to adequate medical care and to humane conditions of confinement. As a direct and proximate result of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN's unconstitutional acts and omissions, in their official capacity, Paul Bulthouse experienced extreme physical pain and suffering, severe mental anguish, and death.

125.    During the morning hours of April 4, 2019, Paul Bulthouse was found dead, naked lying on the floor of his cell. Based on the video, he was found dead over an hour after his last breath is observed.  His death was caused by all defendants alleged herein due to their unlawful, unconstitutional and inhumane conduct and practices alleged herein. The conditions of confinement in which Paul Bulthouse was held were inhumane and in violation of his constitutional rights. From the beginning of his pretrial detention on March 22, 2019, until his death on April 4, 2019, Paul Bulthouse's constitutional rights, including his right to be free from the deliberate indifference to his serious medical needs, his right to be free from excessive force, and his right to be free from cruel and unusual punishment, were continuously and repeatedly violated by the defendants named herein—resulting in 13 days of mental and physical agony, causing and culminating in his death, and giving rise to this action under 42 U.S.C. § 1983.

126.    Despite being indifferent to Paul Bulthouse's serious medical needs that caused him to die in their care and custody, Defendant Muskegon County issued Paul Bulthouse an inmate

housing bill for the thirteen days he was in their custody for a balance of $416.00, however, if he paid within 30 days, they would offer a discount for a balance of $234.00.

127.    Paul Bulthouse did not die immediately, and instead suffered great conscious pain and suffering as a direct and proximate result of the said acts of all Defendants, and the policies and customs of Defendant Muskegon County and Defendant Wellpath.

128.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs pursuant to 42 USC § 1988; and

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

**COUNT I**
**§1983 FAILURE TO PROVIDE MEDICAL CARE /**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**IN VIOLATION OF THE 4TH, 8TH, AND 14TH AMENDMENTS**
**OF THE UNITED STATES CONSTITUTION**
**(ALL DEFENDANTS)**

129.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

130.    That the acts or omissions by all named Defendants in this complaint including: Defendant Muskegon County, Defendant Sheriff Poulin, Defendant Lt. Burns, Defendant Sgt. Vanderlaan, Defendant Deputy Miller,  Defendant Deputy Olson, Defendant Deputy Greve, Defendant Deputy Wall, Defendant Deputy Graviano, Defendant Deputy Perri, Defendant Deputy Lane, Defendant Deputy Patterson, Defendant Deputy Baker, Defendant Wellpath, Defendant Joseph Natole, MD, PC, Defendant Dr. Natole, Defendant Carleen Blanch, RN, Defendant Aubrey Schotts, RN, Defendant Jessica Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, Defendant David Lopez, LPN, Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT and, upon information and belief, Defendant Unknown Deputies was unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with callousness, and deliberate indifference to Plaintiff's Decedent, Paul Bulthouse's well-being and serious medical needs in violation of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

131.    That the Defendants Defendant Muskegon County, Defendant Sheriff Poulin, Defendant Lt. Burns, Defendant Sgt. Vanderlaan, Defendant Deputy Miller,  Defendant Deputy Olson, Defendant Deputy  Greve, Defendant Deputy Wall, Defendant Deputy Graviano, Defendant Deputy Perri, Defendant Deputy Lane, Defendant Deputy Patterson, Defendant Deputy Baker, Defendant Wellpath, Defendant Joseph Natole, MD, PC, Defendant Dr. Natole, Defendant

Carleen Blanch, RN, Defendant Aubrey Schotts, RN, Defendant Jessica Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, Defendant David Lopez, LPN, Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, and, upon information and belief, Defendant Unknown Deputies, possessed a sufficiently culpable state of mind in denying medical care for Plaintiff's Decedent Paul Bulthouse's serious medical needs.

132.     That Plaintiff's Decedent Paul Bulthouse's serious medical conditions were ones that were so obvious that even a lay person would have easily recognized the necessity for a doctor's immediate attention or emergency care.

133.     That Plaintiff's Decedent Paul Bulthouse's serious medical condition deteriorated with the onset of new and alarming symptoms after medical evaluations or medical assessments thus requiring notifying qualified professional medical personnel and/or acute emergency medical care to provide medical care which was not provided by Defendants.

134.     That Plaintiff's Decedent Paul Bulthouse's serious medical conditions were so obvious that any medical attention that he received was so cursory and woefully inadequate amounting to no treatment at all and thus deliberate indifference.

135.     That the aforementioned Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the individual Defendants' conduct as described herein, such that the same also amounted to a deliberate indifference to Plaintiff's Decedent Paul Bulthouse's well-being and serious medical needs.

136.     That the conduct of the aforementioned Defendants, individually, corporately and as agents of said Defendants, deprived Plaintiff's Decedent Paul Bulthouse of his clearly

established rights, privileges, and immunities guaranteed to him under the United States Constitution, specifically those set forth under the 4th, 8th and 14th Amendments, as evidenced by the following particulars, including but not limited to:

a.   Failing to observe and check on Paul Bulthouse as he exhibited numerous serious medical needs and was in distress;

b.   Consciously exposing Paul Bulthouse to an excessive risk of serious harm;

c.   Failing to request medical help during and after being notified and observing that Paul Bulthouse was suffering from severe withdrawal symptoms, dehydration/ malnutrition, hypertension, tachycardia, seizures and status epilepticus;

d.   Ignoring requests to provide Paul Bulthouse with the needed medical treatment;

e.   Failing to request and delaying medical attention when it was apparent that Paul Bulthouse was unresponsive, or his medical conditions / symptoms were deteriorating after being medically assessed;

f.   Failing to request and delaying medical attention when it was apparent that Paul Bulthouse was unresponsive or his medical conditions / symptoms were deteriorating even after being medically assessed, or where Defendant Deputies and Defendant Medical Personnel had reason to believe that the medical assessment of Paul Bulthouse's condition was not reliable;

g.   Failing to determine if Paul Bulthouse was malingering with constant monitoring in the face of his worsening condition;

h.   Failing to transfer Paul Bulthouse to the hospital for treatment, monitoring, observation and supportive measures;

i.   Placing Paul Bulthouse in a holding cell, and failing to observe and/or monitor him, notwithstanding his known serious medical needs;

j.   Failing to perform necessary jail cell checks and observations;

k.   Delaying necessary medical treatment for a serious medical need after symptoms worsened after medical evaluations were conducted;

l.   Failing to properly train and supervise the individuals within the Muskegon County Jail having custodial and/or care giving responsibilities over Paul Bulthouse, to ensure his serious medical needs were timely and properly tended to, and to ensure the above breaches/deviations were not committed.

137.   That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

c.   Conscious pain and suffering, physical and emotional;

d.   Humiliation and/or mortification;

e.   Mental anguish;

f.   Economic damages;

g.   Loss of love, society, and companionship;

h.   Loss of gifts, gratuities, and other items of economic value;

i.   Parental and spousal guidance, training, and support;

j.   Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.   Attorney fees and costs pursuant to 42 USC § 1988;

l.   Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT II**
**CRUEL AND UNUSUAL PUNISHMENT**
**IN VIOLATION OF THE 4TH, 8TH, AND 14TH AMENDMENTS**
**OF THE UNITED STATES CONSTITUTION**
**(ALL DEFENDANTS)**

138.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

139.    Pursuant to the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, at all times relevant, Plaintiff's Decedent Paul Bulthouse had a right to be free from cruel and unusual punishment as a pretrial detainee while incarcerated under the custody and control of all Defendants at the Muskegon County Jail.

140.    Notwithstanding duties to prevent the cruel and unusual punishment of Paul Bulthouse while under their custody and control, all Defendants knowingly incarcerated him under conditions posing and exacerbating a substantial risk of serious harm to him.

141.    All Defendants repeatedly and willfully failed to provide Paul Bulthouse with medical care and/or delayed medical care that was necessary to treat his serious medical needs, and all Defendants repeatedly and willfully failed to provide such treatment, care and assistance, although they were on notice of Paul Bulthouse's serious medical needs, and although they knew that in so doing, they were depriving Paul Bulthouse of basic needs and violating his constitutional rights.

142.    All Defendants also repeatedly and willfully subjected Paul Bulthouse to the unnecessary and wanton infliction of pain by restricting him in a locked cell for many hours in excessively tight belly chains, handcuffs and leg shackles while at times he was experiencing status epilepticus where his involuntary convulsions of his arms and legs were dangerously restricted by the metal restraints. All Defendants repeatedly and willfully subjected Paul Bulthouse to a substantial risk of physical harm as illustrated by the injuries on his body from the restraints, unnecessary infliction of pain, the deprivation of using the bathroom due to the metal restraints, and creating a risk of particular discomfort and humiliation. All Defendants knew that in so doing, they were depriving Paul Bulthouse of basic needs and violating his constitutional rights.

143.    Throughout his incarceration, the inhumane punishment of the restraints, the failure to provide medical treatment and the delay of medical treatment to Paul Bulthouse by each and every Defendant, constituted cruel and unusual punishment in violation of his Fourth, Eighth and Fourteenth Amendment rights.

144.    That the acts or omissions by all Defendants, as more specifically described above, were unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Paul Bulthouse's well-being.

145.    That the law was clearly established at the time of this incident and Defendants' actions were not objectively reasonable and they are not entitled to qualified immunity.

146.    That the Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the individual Defendants' conduct as described herein, such that same also amounted to a deliberate indifference to Paul Bulthouse's well-being.

147.    That the conduct of all of the Defendants, individually, corporately and as agents of said individual Defendants, deprived Paul Bulthouse's of his clearly established rights, privileges, and immunities guaranteed to him under the United States Constitution, specifically those set forth under the Fourth, Eighth and Fourteenth Amendments to same, as evidenced by the following particulars, including but not limited to:

a.    Failing to observe and check on Paul Bulthouse as he exhibited numerous serious medical needs and was in distress;

b.    Consciously exposing Paul Bulthouse to an excessive risk of serious harm;

c.    Failing to request medical help during and after being notified and observing that Paul Bulthouse was suffering from severe withdrawal symptoms, dehydration/ malnutrition, hypertension, tachycardia, seizures and status epilepticus;

d.    Ignoring requests to provide Paul Bulthouse with the needed medical treatment;

e.    Failing to request and delaying medical attention when it was apparent that Paul Bulthouse was unresponsive or his medical conditions / symptoms were deteriorating even after being medically assessed;

f.    Failing to request and delaying medical attention when it was apparent that Paul Bulthouse was unresponsive or his medical conditions / symptoms were deteriorating even after being medically assessed or where Defendant Deputies or Defendant Medical Personnel had reason to believe that the medical assessment of Paul Bulthouse's condition was not reliable;

g.    Failing to transfer Paul Bulthouse to the hospital for treatment, monitoring, observation and supportive measures;

h.    Placing Paul Bulthouse in a holding cell, and failing to observe and/or monitor him, notwithstanding his known serious medical needs;

i.    Failing to perform necessary jail cell checks and observations;

j.     Delaying necessary medical treatment for a serious medical need after symptoms worsened after medical evaluations were conducted;

k.     Applying excessively tight belly chains, handcuffs or shackles to Paul Bulthouse for an unreasonable period of time while locked in a cell which caused mental and bodily injury;

l.     Applying excessively tight belly chains, handcuffs or shackles to Paul Bulthouse while experiencing seizures;

m.     Applying excessively tight belly chains, handcuffs or shackles to Paul Bulthouse to deprive him the ability to humanely use the bathroom;

n.     Failing to properly train and supervise the individuals within the Muskegon County Jail having custodial and/or care giving responsibilities over Paul Bulthouse, to ensure his serious medical needs were timely and properly tended to, and to ensure the above breaches/deviations were not committed.

148.     That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.     Death;

b.     Reasonable medical, hospital, funeral and burial expenses;

c.     Conscious pain and suffering, physical and emotional;

d.     Humiliation and/or mortification;

e.     Mental anguish;

f.     Economic damages;

g.     Loss of love, society, and companionship;

h.     Loss of gifts, gratuities, and other items of economic value;

i.     Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs pursuant to 42 USC § 1988;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

### COUNT III: §1983 EXCESSIVE FORCE
### (DEFENDANT DEPUTIES)

149.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

150.    As more fully described in the preceding paragraphs, the intentional conduct of Defendant Deputies and upon information and belief Unknown Defendant Officers toward Paul Bulthouse was objectively unreasonable and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

151.    The use of belly chains, handcuffs and leg shackles that were excessively tight during Paul Bulthouse's incarceration at the Muskegon County Jail, included by not limited to the instances on the produced video depicted on April 1, 2019, and April 4, 2019, was an unreasonable use of force that caused harm to Paul Bulthouse's body as described above.

152.    Upon information and belief, Defendant Deputies and upon information and belief Unknown Defendant Deputies were aware of the misconduct of his/her fellow officer(s) with

respect to Paul Bulthouse, had a reasonable opportunity to intervene to prevent it, but failed to do so.

153.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs pursuant to 42 USC § 1988;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT IV: §1983 INDIVIDUAL SUPERVISORY LIABILITY
## (DEFENDANT SGT. VANDERLAAN, DEFENDANT DR. NATOLE, and
## DEFENDANT DAVID LOPEZ, LPN)

154.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

155.    That Defendant Sgt. Vanderlaan, Defendant Dr. Natole, Defendant David Lopez, LPN, and upon information and belief Unknown Defendant Officers directly participated in the unconstitutional conduct of their subordinate Defendant Deputies' and / or Defendant Medical Personnel's conduct when they were deliberately indifferent to Paul Bulthouse's serious medical needs, when they conducted cruel and unusual punishment, and when they exerted excessive force on him violating his constitutionally protected rights as more fully described above and below.

156.    As a result of Defendant Sgt. Vanderlaan, Defendant Dr. Natole, Defendant David Lopez, LPN, and upon information and belief Unknown Defendant Officers' own actions or inactions, Paul Bulthouse was subjected to deprivation of his constitutional rights as more fully described above and below.

157.    That Defendant Sgt. Vanderlaan, Defendant Dr. Natole, Defendant David Lopez, LPN, and upon information and belief Unknown Defendant Officers implicitly authorized, approved or knowingly authorized the misconduct as more fully described above and below.

158.    That Defendant Sgt. Vanderlaan, Defendant Dr. Natole, Defendant David Lopez, LPN, and upon information and belief Unknown Defendant Officers, did directly conspire, actively participate with and encourage the described unlawful conduct and deprivation of Paul Bulthouse's constitutional rights.

159.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.      Death;

b.      Reasonable medical, hospital, funeral and burial expenses;

c.      Conscious pain and suffering, physical and emotional;

d.      Humiliation and/or mortification;

e.      Mental anguish;

f.      Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs pursuant to 42 USC § 1988;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

### COUNT V
### §1983 FAILURE TO INTERVENE TO PREVENT VIOLATION OF Paul Bulthouse's
### 4TH, 8TH AND 14TH AMENDMENT RIGHTS
### (DEFENDANT DEPUTIES and DEFENDANT MEDICAL PERSONNEL)

160.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

161.    Defendant Deputies and Defendant Medical Personnel had a duty to intervene when Paul Bulthouse's rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and 42 USC § 1983, were violated by failing to ensure that medical treatment for a serious medical need was obtained, that he was not subjected to cruel and unusual punishment and that he was not subject to the use of excessive force.

162.    Defendant Deputies and Defendant Medical Personnel observed or had reason to know that Paul Bulthouse had serious medical needs that required immediate medical treatment and were deliberately indifferent to that need, that he was being subjected to cruel and unusual punishment and was the victim of excessive force.

163.    Defendant Deputies and Defendant Medical Personnel were deliberately indifferent to Paul Bulthouse's serious medical needs, acted with conduct that was cruel and unusual punishment, and subjected Paul Bulthouse to the use of excessive force. Defendant Deputies and Defendant Medical Personnel failed to intervene despite their duty to do so, and were each thereby a direct and proximate cause of his pain, suffering and death.

164.    The foregoing conduct by Defendant Deputies and Defendant Medical Personnel, itself amount to a constitutional violation of Paul Bulthouse's rights under the Fourth, Eighth, and/or Fourteenth Amendments to United States Constitution.

165.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.      Mental anguish;

f.      Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs pursuant to 42 USC § 1988;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

### COUNT VI: §1983 MUNICIPAL/SUPERVISORY LIABILITY: (DEFENDANT COUNTY OF MUSKEGON, DEFENDANT SHERIFF POULIN AND DEFENDANT LT. BURNS)

166.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

167.    Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Burns acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs, policies, and/or practices that resulted in violations to Paul Bulthouse's constitutional rights of citizens to be free from violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

168.    At all times relevant, Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Burns refused to provide the Defendant Deputies, any training, discipline and supervision with regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution; refused to provide Defendant Deputies with supervision and discipline to protect the constitutional rights of citizens, refused to require the Defendant Deputies, to follow policies and procedures and state and federal law relating to the right of an inmate to be provided with  medical care for serious medical needs.

169.    At all times relevant, Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Burns knew or should have known that the policies, procedures, training supervision and discipline of the Defendant Deputies, were inadequate for the tasks that each Defendant was required to perform.

170.    At all times relevant, there was a complete failure to train, supervise and discipline the Defendant Deputies, and the training, supervision and lack of discipline were so reckless that future violations of the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, was certain to occur.

171.    At all times relevant, Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Burns were on notice and knew that the failure of training, discipline and/or supervision of the Defendant Deputies and Defendant Medical Personnel with regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, was inadequate and would lead to the violation of inmates' constitutional rights.

172.    At all times relevant, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns' response to this knowledge was so inadequate as to show a complete

disregard for whether the Defendant Deputies and Defendant Medical Personnel would violate the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

173. Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns' implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the serious medical needs and cruel and unusual punishment of citizens, and knew or should have known that such treatment would deprive inmates of their constitutional rights.

174. At all times relevant, there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs.

175. At all times relevant, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns' knew or should have known that there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs.

176. Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns tolerated Defendant Deputies and Defendant Medical Personnel's repeated violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, which allowed Defendant Deputies to continue to engage in this unlawful conduct.

177. Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns refused to discipline Defendant Deputies and Defendant Medical Personnel who violated citizens' constitutional rights to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, failed to fully investigate allegations of misconduct, looked the other way and, thus, tacitly encouraged such behavior. In doing so, Defendant Muskegon County,

Defendant Sheriff Poulin, and Defendant Lt. Burns condoned, ratified or encouraged Defendant Deputies and Defendant Medical Personnel to violate the Fourth, Eighth and Fourteenth Amendment to the United States Constitution as a matter of policy.

178. These customs, policies, and/or practices included but were not limited to the following:

a. Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying when an inmate is experiencing a medical need and/or medical emergency;

b. Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in documenting the condition(s) of detainee status when that detainee requires monitoring;

c. Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine what constitutes a need for emergency medical treatment and when to alert medical personnel;

d. Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine when to re-alert medical personnel based upon new and alarming symptoms, and/or worsening conditions;

e. Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine what is both an active emergency, and what is an acute emergency, and when to call 911;

f. Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying severe and serious symptoms of substance use disorder,

alcohol withdrawal, and benzodiazepine withdrawal, neurological disorder, tachycardia, seizures, head/brain trauma, and/or hypertension;

g.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying repeated seizures, known as status epilepticus;

h.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure regarding the use of force, restraints, handcuffs, and belly chains, or a combination thereof, and the use of restraints, handcuffs, and belly chains, or a combination thereof when locked in a cell and/or when an inmate is experiencing a medical emergency, including but not limited to seizures or other medical crises;

i.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in recognizing behavioral and/or psychological issues that require the presence of medical personnel;

j.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to know when to re-alert medical staff during a medical need or medical emergency, and if an inmate has worsening conditions and new/alarming symptoms;

k.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in recognizing behavioral and/or psychological issues related to escape and/or escape attempts;

l.  Failure to adequately train or provide any type of ongoing training program for its deputies related to what deputies should do during active emergencies and medical emergencies, including but not limited to communication with medical personnel, and monitoring inmates/detainees who may experience such emergency;

m.  Maintaining constitutionally inadequate policies and procedures related to communication amongst its deputies and between its medical personnel and deputies regarding detainees who are at risk of benzodiazepine withdrawal, alcohol withdrawal, seizures and withdrawal from other prescription medication and substances;

n.  Maintaining unconstitutional policies and practices that would allow deputies to completely disregard and ignore the basic nutritional and hydration needs of an inmate;

o.  Maintaining a practice and policy of utilizing deputies to closely observe inmates going through withdrawal, delirium tremens, status epilepticus and/or mental health issues, on video monitors, but in turn not providing appropriate and effective training to the video monitoring deputies to recognize and react accordingly to life threatening symptoms or behaviors of those inmates.

p.  Failing to adequately train and/or supervise its personnel and contracted-for providers with regard to complying with constitutionally-minimal rights of confined persons to medical care for serious medical needs, food, water, and humane conditions of confinement.

q.  Failing to supervise, review, and/or discipline officers whom Defendant Lt. Burns, Defendant Sheriff Poulin and Defendant Muskegon County knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its deputies to engage in such conduct;

r.  Failing to require compliance of its deputies and/or employees with established policies and/or procedures and/or rules and discipline or reprimand officers who violate these established policies;

67

s.   Engaging in a pattern and practice of denying needed prescription medication to detainees and inmates. In the years leading up to Paul Bulthouse's death, numerous other detainees and inmates in Michigan and elsewhere were denied or delayed needed medical care and needed prescription medications in order to avoid the cost and expense of such medical care and medications;

t.   Otherwise failing to adequately train and/or follow proper policy, practice, or procedure resulting in the death of Paul Bulthouse.

179.   Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns further maintained a practice of informing and training their personnel that all corrections officers could do to fulfill their constitutional obligations under the Fourth, Eighth and Fourteenth Amendments pertaining to medical care for inmates' serious medical needs was to refer all medical problems to their designated contracted-for medical provider, Defendant Wellpath, before seeking emergency medical attention for an inmate who is experiencing an obvious medical emergency. This deliberate and mistaken training policy and practice was a moving force behind Defendant Deputies' failure to respond to Paul Bulthouse's serious medical condition in a meaningful and constitutionally consistent fashion- including directly calling for emergency medical care in spite of the inadequate and insufficient medical care provided Bulthouse, and/or going beyond the Muskegon County Deputy's normal chain of corrections' command unit if the command officers continued to rely on Defendant Wellpath's medical decisions that were not recognizing a serious risk of harm or death to an inmate such as Paul Bulthouse.

180.   Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns have engaged in a pattern or practice or custom of unconstitutional conduct toward confined persons such as Paul Bulthouse with serious medical and mental health needs. This included a

pattern, practice, or custom of not securing medical care, or emergency care when necessary, on a timely basis, so as to alleviate an inmate's unnecessary pain. This included a pattern, practice, or custom of not securing medical care for detainees who are suffering from withdrawal, mental health crises, dehydration, and/or malnourishment.

181.    In addition to the daily practices and customs of unconstitutional conduct towards Paul Bulthouse, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns committed serial and unconstitutional acts of deliberate indifference to the medical needs of inmates such as Dahnontae R. McKinley and Mark Erwin Ferguson, both who previously died in the care and custody of the Muskegon County Jail due to Defendants' deliberate indifference to their serious medical needs and failure to adequately train and/or supervise its personnel regarding the above policies. Therefore, Defendants were put on notice of such unconstitutional conduct prior to the unconstitutional actions upon Paul Bulthouse.

182.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns did not adequately monitor the performance of Defendant Wellpath or its agents and allowed the ongoing practice of substandard medical care and mental health care to continue, putting the lives of its inmates at risk.

183.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns had notice or were constructively aware that Defendant Wellpath, formerly known as Correct Care Solutions, had a history of providing constitutionally inadequate medical care to inmates in the past and thus tacitly approved such unconstitutional conduct. That their deliberate indifference in their failure to act amounted to an official policy of inaction and that the policy of inaction was the moving force of the constitutional deprivations.

184.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns have the responsibility and authority to investigate the death of any inmates in the custody of the

Muskegon Sheriff's Department and/or the Muskegon County Jail, and as a matter of acts, custom, policy, and/or practice, Defendants failed to adequately and property investigate the death of Paul Bulthouse, including failure to perform a thorough investigation into all of the events relating to the death of Paul Bulthouse and/or failing to thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the death of Paul Bulthouse.

185.    Plaintiff's injuries in this case were proximately caused by policies and practices of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns, which by their deliberate indifference, allows their deputies to violate the constitutional rights of citizens without fear of any meaningful investigation or punishment.  In this way, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns violated Plaintiff's rights since they created the opportunity for the individually named Defendant Deputies to commit the foregoing constitutional violations.

186.    The misconduct described in preceding paragraphs has become a widespread practice, and so well settled as to constitute *de facto* policy in the Muskegon County Sheriff's Department.  This policy was able to exist and thrive because governmental policymakers have exhibited deliberate indifference to the problem, thereby ratifying it.

187.    The widespread practice described in preceding paragraphs was allowed to flourish because Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns have declined to implement sufficient hiring, training and/or legitimate and/or effective mechanisms for oversight and/or punishment of police officer misconduct.

188.    The policies and practices of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns directly and proximately led to the injuries and death that Paul Bulthouse suffered at the hands of Defendant Deputies and Unknown Defendant Deputies.

189.    That the above described conduct of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Burns, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs pursuant to 42 USC § 1988;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT VII: §1983 MUNICIPAL/SUPERVISORY LIABILITY:**
**(DEFENDANT WELLPATH, DEFENDANT DR. NATOLE in his capacity as the**
**Medical Director of the Muskegon County Jail, and DEFENDANT DAVID LOPEZ, LPN,**
**in his capacity as the Health Services Administrator of the Muskegon County Jail)**

190.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

191.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs, policies, and/or practices that resulted in violations to Paul Bulthouse's constitutional rights of citizens to be free from violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

192.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, refused to provide the Defendant Medical Personnel any training, discipline and supervision with regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution; refused to provide Defendant Medical Personnel, with supervision and discipline to protect the constitutional rights of citizens, refused to require the Defendant Medical Personnel, to follow policies and procedures and state and federal law relating to the right of an inmate to be provided with medical care for serious medical needs.

193.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, knew or should have known that the policies, procedures, training supervision and discipline of the Defendant Medical Personnel, were inadequate for the tasks that each Defendant was required to perform.

194.    At all times relevant, there was a complete failure to train, supervise and discipline the Defendant Medical Personnel, and the training, supervision and lack of discipline were so

reckless that future violations of the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, was certain to occur.

195.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, was on notice and knew that the failure of training, discipline and/or supervision of Defendant Medical Personnel with regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs, was inadequate and would lead to the violation of inmates' constitutional rights.

196.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN's response to this knowledge was so inadequate as to show a complete disregard for whether Defendant Medical Personnel would violate the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

197.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN's implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the serious medical needs and cruel and unusual punishment of citizens, and knew or should have known that such treatment would deprive inmates of their constitutional rights.

198.    At all times relevant, there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs.

199.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, knew or should have known that there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the Fourth, Eighth and

Fourteenth Amendments to the United States Constitution, as described in the preceding paragraphs.

200.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, tolerated Defendant Medical Personnel's repeated violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, which allowed the Defendant Medical Personnel to continue to engage in this unlawful conduct.

201.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, refused to discipline Defendant Medical Personnel who violated citizens' constitutional rights to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, failed to fully investigate allegations of misconduct, looked the other way and, thus, tacitly encouraged such behavior.   In doing so, Defendant Wellpath condoned, ratified or encouraged Defendant Medical Personnel to violate the Fourth, Eighth and Fourteenth Amendment to the United States Constitution as a matter of policy.

202.    These customs, policies, and/or practices included but were not limited to the following:

   a.   Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying when an inmate is experiencing a medical need and/or medical emergency;

   b.   Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in documenting the condition(s) of detainee status when that detainee requires monitoring;

   c.   Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine what constitutes a need for emergency medical treatment;

d.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine what is both an active emergency, and what is an acute emergency;

e.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying severe and serious symptoms of substance use disorder, alcohol withdrawal, and benzodiazepine withdrawal, neurological disorder, tachycardia, seizures, head/brain trauma, and/or hypertension;

f.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying repeated seizures, also known as status epilepticus, both convulsive and non-convulsive;

g.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure regarding the safe use of use of force restraints, handcuffs, and belly chains, or a combination thereof, and the safe use of restraints, handcuffs, and belly chains, or a combination thereof when locked in a cell and/or when an inmate is experiencing a medical emergency, including but not limited to seizures or other medical crises;

h.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in knowing when to evaluate, observe, check vitals, and/or otherwise provide medical care during a medical need or medical emergency;

i.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in recognizing behavioral and/or psychological issues that require the presence of medical personnel;

j.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in recognizing behavioral and/or psychological issues related to escape and/or escape attempts;

k.  Failure to adequately train, and/or failure to follow proper policy, practice, and/or procedure for amending, altering, or reinstating benzodiazepine or alcohol withdrawal regimens and/or protocols, and/or lack of any policy for amending, altering, or reinstating benzodiazepine or alcohol withdrawal regimens and/or protocols;

l.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to contact a health care professional, when certain vital signs are outside of designated parameters during CIWA-Ar assessments, and/or lack of any policy for follow-up after CIWA-Ar assessment completed and patient is still experiencing certain vital signs outside of designated parameters and/or withdrawal symptoms;

m.  Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure for ensuring meaningful follow-up care when a patient is assessed by medical personnel and requires additional monitoring or care instructions, and/or lack of any policy ensuring meaningful follow-up care when a patient is assessed by medical personnel and requires additional monitoring or care instructions;

n.  Failure to adequately train or provide any type of ongoing training program for its medical personnel;

o.  Maintaining constitutionally inadequate policies and customs, including: (i) constitutionally deficient screening policies and procedures that were inadequate to protect detainees, like Paul Bulthouse, from the serious medical consequences of benzodiazepine withdrawal, alcohol withdrawal, and withdrawal from other

76

prescription medication and substances, (ii) unconstitutional policies and procedures for managing individuals who were going through benzodiazepine withdrawal, and withdrawal from other prescription medication and substances, and (iii) constitutionally inadequate policies and procedures related to necessary communication amongst its own Defendant Medical Personnel, and between its Defendant Medical Personnel and Defendant Deputies regarding detainees who are at risk of benzodiazepine withdrawal, alcohol withdrawal, seizures and withdrawal from other prescription medication and substances;

p.  Failing to adequately train and/or supervise personnel, agents, subcontractors, or independent contractors, with regard to responding to inmates who were using benzodiazepines prior to their incarceration and thus face risk of experiencing severe and life-threatening withdrawal symptoms in jail;

q.  Failure to adequately train and/or supervise its personnel, agents, subcontractors, or independent contractors, with regard to complying with constitutionally-minimal rights of confined persons to medical care, food, and water. This includes the deliberate choice not to provide any training and/or inadequate training on (i) the subject of benzodiazepine withdrawal, alcohol withdrawal and withdrawal from other prescription medication and substances, (ii) the subject of managing and responding to detainees who are in mental health crisis, such as individuals suffering from acute benzodiazepine withdrawal psychosis, and (iii) the subject of dehydration and malnourishment. This failure includes the deliberate choice not to provide training and/or ongoing training to detention staff personnel on recognizing the signs, symptoms and seriousness of alcohol and/or benzodiazepine withdrawal. As of the time of Paul Bulthouse's pretrial detention, there had been numerous

instances in Michigan and nationwide of inmates and detainees being deprived of medical care by Defendant Wellpath, and/or Defendant Dr. Natole, and/or Defendant David Lopez, LPN, and their agents or employees as a result of the deliberately indifferent corporate customs and practices described herein.

r.  Engaging in a pattern and practice of delaying or denying needed medical care and medications to detainees and inmates. As of the time of Paul Bulthouse's pretrial detention, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, were put on notice of its employees' ignorance and failure to follow its written policies, procedures, and protocols for inmates experiencing withdrawal from benzodiazepines, and other controlled substances, along with symptoms of dehydration and seizures. *Stojcevski v. Macomb County, et al*; Case No.: 15-cv-11019 (E.D.MI.); *Estate of Walter v. Corr. Healthcare Co.*, 323 F.Supp. 3d 1199 (D.Colo. 2018) The inmate in *Stojcevski* and *Walter* died as a result.

s.  Engaging in a pattern and practice of routinely minimizing inmates experiencing withdrawal symptoms, such as seizures, as malingerers, or "faking" or "factitious" without proper follow-up medical care to prove or disprove the belief. As of the time of Paul Bulthouse's pretrial detention, Defendant Wellpath was put on notice of its employees ignorance to life-threatening medical condition, such as recurring seizures (status epilepticus). *Stojcevski v. Macomb County, et al*; Case No.: 15-cv-11019 (E.D.MI.); *Estate of Walter v. Corr. Healthcare Co.*, 323 F.Supp. 3d 1199 (D.Colo. 2018);

t.  Engaging in a pattern and practice of denying needed prescription medication to detainees and inmates. In the years leading up to Paul Bulthouse's death, numerous other detainees and inmates in Michigan and elsewhere were denied or delayed

needed medical care and needed prescription medications in order to avoid the cost and expense of such medical care and medications;

u. Failing to adequately train and/or supervise its personnel and contracted-for providers with regard to complying with constitutionally-minimal rights of confined persons to medical care for serious medical needs, food, water, and humane conditions of confinement.

v. Failing to supervise, review, and/or discipline medical personnel whom Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its medical personnel to engage in such conduct;

w. Failing to require compliance of its employees with established policies and/or procedures and/or rules and discipline or reprimand medical personnel who violate these established policies;

x. Failure to train regarding and/or maintain policies to timely and appropriately provide medications, assessments, and ongoing monitoring in treating patients who suffer from neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension who exhibit symptoms of alcohol and/or benzodiazepine withdrawal or seizures;

y. Failure to train, and/or maintain policies to timely and appropriately timely and appropriately recognize that a patient's symptoms and signs of withdrawal such as but not limited to seizures, delirium tremens, delirium hallucinations, changes in consciousness, profound agitation, and autonomic instability, require hospitalization and provide immediate hospitalization;

z.  Failure to train, and/or maintain policies to timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of reoccurring seizures and/or status epilepticus and that such a condition can be life threatening if not properly managed by a qualified physician and/or immediate hospitalization;

aa. Failure to train, and/or maintain policies regarding timely collaboration with appropriate physicians and clinicians to establish optimal treatment plans and to achieve favorable patient outcomes;

bb. Failure to train, and/or maintain policies to timely and appropriately report to a physician and/or provide a patient, who was exhibiting signs of alcohol and/or benzodiazepine withdrawal, a targeted physical examination that includes vital signs and an evaluation of cardiovascular, neurologic and mental health status;

cc. Failure to train, and/or maintain policies to timely and adequately perform an examination and develop an assessment and treatment plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from a serious medical condition such as seizures, namely status epilepticus with a physician;

dd. Otherwise failing to adequately train and/or follow proper policy, practice, or procedure resulting in the death of Paul Bulthouse.

203.  Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, have engaged in a pattern or practice or custom of unconstitutional conduct toward confined persons such as Paul Bulthouse with serious medical and mental health needs. This included a pattern, practice, or custom of not providing medical care, or emergency care when necessary, on a timely basis, so as to alleviate an inmate's unnecessary pain. This included a pattern, practice, or

custom of not securing medical care for detainees who are suffering from withdrawal, mental health crises, dehydration, and/or malnourishment.

204.    Paul Bulthouse's injuries in this case were proximately caused by policies and practices of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, which by their deliberate indifference, allows their agents and employees to violate the constitutional rights of citizens without fear of any meaningful investigation or punishment.   In this way, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN violated Paul Bulthouse's rights since it created the opportunity for Defendant Medical Personnel to commit the foregoing constitutional violations.

205.    The misconduct described in preceding paragraphs has become a widespread practice, and so well settled as to constitute *de facto* policy for Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN.   This policy was able to exist and thrive because governmental policymakers have exhibited deliberate indifference to the problem, thereby ratifying it.

206.    The widespread practice described in preceding paragraphs was allowed to flourish because Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, have declined to implement sufficient hiring, training and/or legitimate and/or effective mechanisms for oversight and/or punishment of misconduct.

207.    The policies and practices of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, directly and proximately led to the injuries and death that Paul Bulthouse suffered at the hands of Defendant Medical Personnel.

208.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.     Death;

b.     Reasonable medical, hospital, funeral and burial expenses;

c.     Conscious pain and suffering, physical and emotional;

d.     Humiliation and/or mortification;

e.     Mental anguish;

f.     Economic damages;

g.     Loss of love, society, and companionship;

h.     Loss of gifts, gratuities, and other items of economic value;

i.     Parental and spousal guidance, training, and support;

j.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.     Attorney fees and costs pursuant to 42 USC § 1988;

l.     Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT VIII
## STATE LAW CLAIMS OF
## GROSS NEGLIGENCE, AND/OR WANTON AND WILLFUL MISCONDUCT
## (ALL DEFENDANTS)

209.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

210. That in taking custody of Paul Bulthouse, all Defendants undertook and owed a duty to him to make reasonable efforts to care for him in a reasonable and prudent manner, to exercise due care and caution, and in such operation as the rules of the common law require, and in accordance with the customs, policies and procedures.

211. That all Defendants breached each and every duty owed to Paul Bulthouse.

212. That notwithstanding the aforementioned duties, the aforementioned Defendants took into custody, incarcerated, and monitored Paul Bulthouse in an extremely careless, grossly negligent, reckless, and wanton and willful manner without concern whatsoever for his safety and welfare, and failed to tend to his serious medical needs, including, but not limited to, the following particulars by way of illustration and not limitation:

a. Failing to observe and check on Paul Bulthouse;

b. Failing to request medical care and assistance for Paul Bulthouse;

c. Failing to secure medical care while Paul Bulthouse was obviously suffering from seizures, status epilepticus, severe withdrawals symptoms, tachycardia, and/or hypertension

d. Failing to request medical help or emergency medical help in a timely manner before the death of Paul Bulthouse;

e. Failing to take Paul Bulthouse to the hospital while he was obviously suffering from seizures, status epilepticus, severe withdrawals symptoms, tachycardia, and hypertension

f. Failing to provide adequate reporting and responding to his severe withdrawal symptoms and / or seizures in a timely manner for Paul Bulthouse to have received the necessary medical care;

g. Placing Paul Bulthouse in excessively tight belly chains, handcuffs and/or shackles while experiencing severe withdrawal symptoms or while experiencing seizures;

h.      Failing to monitor Paul Bulthouse who was known to be suffering;

i.      Failing to monitor Paul Bulthouse after a failed withdrawal regimen;

j.      Failing to maintain proper observation and/or supervision of Paul Bulthouse;

k.      Failing to properly train and supervise the individuals within the aforementioned facility having custodial and/or care giving responsibilities over Paul Bulthouse to ensure his serious medical needs were timely and properly tended to, and to ensure the above breaches/ deviations were not committed.

213.    That the above-described actions and/or inactions violated MCL 691.1407 in that they amounted to gross negligence, specifically conduct so reckless as to demonstrate a substantial disregard for whether an injury resulted to the Paul Bulthouse.

214.    That Defendants are not entitled to governmental immunity based upon their actions.

215.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.      Death;

b.      Reasonable medical, hospital, funeral and burial expenses;

c.      Conscious pain and suffering, physical and emotional;

d.      Humiliation and/or mortification;

e.      Mental anguish;

f.      Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

     j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

     k.      Attorney fees and costs if applicable;

     l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT IX**
**MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE**
**(DEFENDANT DR. JOSEPH NATOLE, M.D.)**

216.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

217.    In treating Paul Bulthouse, Defendant Dr. Natole was required to provide the recognized standard of practice or care within his specialty as a Family Practice Physician and was required to render care as a reasonable and prudent physician board certified and specializing in Family Practice Physician. (The Affidavit of Merit of Grant Phillips, M.D. is attached hereto)

218.    The applicable standard of practice/care required that Defendant Dr. Natole timely and appropriately do all of the following, which he failed to do, and is, therefore, professionally negligent:

     a.      Exercise that degree of reasonable medical judgment and provide appropriate medical care that a reasonable family medicine practitioner would under same or similar circumstances;

85

b.  Be familiar with and comply with national and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or exhibiting signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

c.  Timely and appropriately assess whether a patient suffers from a substance use disorder and safely and effectively treat withdrawal symptoms and syndromes;

d.  Timely and appropriately complete an assessment of a patient's medical history and medications prescribed to properly engage a proper withdrawal plan with necessary medications and tapering schedules for patients that present with and/or exhibit signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

e.  Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, tachycardia, head/brain trauma, seizures and hypertension are at  greater risk for severe withdrawal symptoms and complications thus mandating closer monitoring by appropriately trained medical personnel;

f.  Timely and appropriately provide medications, medical assessments, and ongoing monitoring in treating patients who suffer from neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension who exhibit symptoms of alcohol and/or benzodiazepine withdrawal or seizures;

g.  Timely and appropriately recognize that a patient's symptoms and signs of withdrawal such as but not limited to seizures, delirium tremens, delirium

hallucinations, changes in consciousness, profound agitation, and autonomic instability, require hospitalization and provide immediate hospitalization;

h.   Timely and appropriately recognize that the monitoring scale of CIWA-Ar is to not be used for benzodiazepine withdrawal as stated by the Federal Bureau of Prisons and to adequately monitor such benzodiazepine withdrawal to decrease the progression of withdrawal symptoms from early withdrawal to mid withdrawal to late withdrawal requiring hospitalization;

i.   Timely and appropriately provide a patient, who was exhibiting signs of alcohol and/or benzodiazepine withdrawal, a targeted physical examination that includes vital signs and an evaluation of cardiovascular, neurologic and mental health status;

j.   Timely and appropriately recognize when a patient is at high risk for developing alcohol and/or benzodiazepine withdrawals and that such conditions can be life-threatening if not properly managed by a physician or psychiatrist;

k.   Ensure that the properly trained medical personnel perform an examination and develop an assessment and treatment plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from seizures, namely status epilepticus;

l.   Timely and adequately supervise medical personnel to perform an examination and develop an assessment and treatment plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from a serious medical condition such as seizures, namely status epilepticus;

m.   Timely and adequately provide appropriate care, monitoring, and treatment for a patient who is suffering from delirium tremens, and alcohol withdrawal, benzodiazepine withdrawals and /or seizures;

n.  Perform timely and accurate comprehensive assessments and examination of the patient to assess his risk for delirium tremens and alcohol withdrawal and appreciate a thorough history and mental health examination when the history provided is that the examinee is going through the delirium tremens for alcohol withdrawal;

o.  Keep apprised of the patient's status and changes in their condition after observing that he was experiencing symptoms associated with alcohol and/or benzodiazepine withdrawal or a seizure;

p.  Timely and appropriately recognize and/or diagnose that a patient is experiencing a serious medical condition in the form of reoccurring seizures and/or status epilepticus and that such a condition can be life threatening if not properly managed by a qualified physician and/or  immediate hospitalization;

q.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and provide proper medications and hospitalization;

r.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and ensure that the patient undergoes medical treatment for this urgent and life-threatening medical condition;

s.  Keep apprised of the patient's status and changes in their medical condition after observing that the patient was experiencing seizures that may not have been associated with substance use withdrawals given the timing, duration and number of such seizures;

t.  Timely and appropriately follow the national standard issued by the American Epilepsy Society guideline for evaluating and treating individuals with status

88

epilepticus;

u.  Timely and appropriately treat an individual experiencing seizure activity within the first 0-5 minutes "Stabilization Phase" by stabilizing patient, timing the seizure from its onset, monitoring vital signs, assessing oxygenation, giving oxygen via nasal cannula/mask, considering intubation if respiratory assistance is needed, initiating ECG monitoring, collecting finger stick blood glucose and appropriately administering medication, attempting IV access and collecting electrolytes, hematology, toxicology screens and anticonvulsant drug levels; Timely and appropriately treat an individual experiencing continued seizure activity within the 5-20 minute "Initial Therapy Phase" by providing a benzodiazepine with prescribed guideline dosage and frequency;

v.  Timely and appropriately consult with the patient's primary care physician or prescribing doctor regarding the results of any jail medical assessments and evaluations of the patient so as to obtain proper medical treatment for them;

w.  Upon a certain scoring on the monitoring scale of CIWA-Ar, to timely and appropriately follow the prescribed medical treatment plan for a patient;

x.  Properly supervise any nurse or emergency medical technician ensuring they adequately treat a patient suffering from alcohol and / or benzodiazepine withdrawals, seizures or the life-threatening condition of status epilepticus;

y.  Other acts of professional negligence yet to be determined.

219.  At all times relevant to the care and treatment of Paul Bulthouse, Defendant Dr. Natole, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent in his care and treatment of Decedent.

220.  The above breaches of the standard of care by Defendant Dr. Natole were the

proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

221.    The above breaches of the standard of care by Defendant Dr. Natole were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

222.    That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

223.    Defendant Joseph Natole, Jr., M.D. P.C. through his agents and employees, including but not limited to, Defendant Dr. Joseph Natole, MD, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

224.    Defendant Wellpath, through his agents and employees, including but not limited to Defendant Dr. Joseph Natole, MD, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

225.    Defendant Muskegon County through his agents and employees, upon information and belief, including but not limited to, Defendant Dr. Joseph Natole, MD, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe*

*v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

226.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Dr. Natole.

227.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Dr. Natole.

228.     That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

        a.      Death;

        b.      Reasonable medical, hospital, funeral and burial expenses;

        c.      Conscious pain and suffering, physical and emotional;

        d.      Humiliation and/or mortification;

        e.      Mental anguish;

        f.      Economic damages;

        g.      Loss of love, society, and companionship;

        h.      Loss of gifts, gratuities, and other items of economic value;

        i.      Parental and spousal guidance, training, and support;

        j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

        k.      Attorney fees and costs if applicable;

        l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a judgment against Defendant in an amount in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, plus costs, interest and attorney fees.

**COUNT X**
**MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE**
**(DEFENDANT CARLEEN BLANCHE, R.N., and**
**DEFENDANT AUBREY SCHOTTS, R.N.)**

229.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

230.    In treating Paul Bulthouse, Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., were required to provide the recognized standard of practice or care within their specialty as a registered nurse and were required to render care as a reasonable and prudent registered nurse of average training, experience and education under the same or similar clinical circumstances as pertains to Paul Bulthouse as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, pertaining to their rendering care to Plaintiff's decedent Paul Bulthouse. (The Affidavit of Merit of Denise Panosky, R.N., is attached hereto)

231.    The applicable standard of practice/care required that Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., timely and appropriately do all of the following, which they failed to do, and are, therefore, professionally negligent:

a.  Exercise that degree of reasonable judgment and provide appropriate care that a reasonable registered nurse would under same or similar circumstances;

b.  Be familiar with and comply with national and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or

92

exhibiting signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus, and hypertension;

c.  Timely and appropriately assess whether a patient suffers from a substance use disorder and safely and effectively treat withdrawal symptoms and syndromes;

d.  Timely and appropriately complete an assessment of a patient's medical history and medications prescribed to properly engage a proper withdrawal plan with necessary medications and tapering schedules for patients that present with and/or exhibit signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

e.  Timely and appropriately recognize withdrawal from alcohol and withdrawal from benzodiazepines;

f.  Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, tachycardia, head/brain trauma, seizures and hypertension are at greater risk for severe withdrawal symptoms and complications thus mandating closer monitoring by appropriately trained medical personnel;

g.  Timely and appropriately provide medications, assessments, and ongoing monitoring in treating patients who suffer from neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension who exhibit symptoms of alcohol and/or benzodiazepine withdrawal or seizures;

h.  Timely and appropriately recognize that a patient's symptoms and signs of withdrawal such as but not limited to seizures, delirium tremens, delirium hallucinations, changes

in consciousness, profound agitation, and autonomic instability, require hospitalization and provide immediate hospitalization;

i.   Timely and appropriately refer a psychological or psychiatric evaluation of patient;

j.   Timely and appropriately recognize that the monitoring scale of CIWA-Ar is to not be used for benzodiazepine withdrawal as stated by the Federal Bureau of Prisons and to adequately monitor such benzodiazepine withdrawal to decrease the progression of withdrawal symptoms from early withdrawal to mid withdrawal to late withdrawal requiring hospitalization;

k.    Timely and appropriately report to a physician and/or provide a patient, who was exhibiting signs of alcohol and/or benzodiazepine withdrawal, a targeted physical examination that includes vital signs and an evaluation of cardiovascular, neurologic and mental health status;

l.   Timely and appropriately recognize that a patient is at high risk for developing alcohol and/or benzodiazepine withdrawals and that such conditions can be life-threatening if not properly managed by a physician or psychiatrist and to report such to a physician or psychiatrist;

m.  Develop an assessment and plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from seizures, namely status epilepticus;

n.   Timely and adequately perform an examination and develop an assessment and treatment plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from a serious medical condition such as seizures, namely status epilepticus with a physician;

o.   Timely and adequately provide appropriate care, monitoring, and treatment for a patient who is suffering from insomnia, delirium tremens, and alcohol withdrawal,

benzodiazepine withdrawals and /or seizures;

p.  Perform timely and accurate comprehensive assessments of the patient to assess his risk for delirium tremens and alcohol withdrawal and appreciate a thorough history and mental health examination when the history provided is that the examinee is going through the delirium tremens for alcohol withdrawal;

q.  Keep apprised of the patient's status and changes in their condition after observing that he was experiencing symptoms associated with alcohol and/or benzodiazepine withdrawal or a seizure;

r.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of reoccurring seizures and/or status epilepticus and that such a condition can be life threatening if not properly managed by a qualified physician and/or immediate hospitalization;

s.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and provide proper medications and hospitalization;

t.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and ensure that the patient undergoes medical treatment for this urgent and life-threatening medical condition;

u.  Keep apprised of the patient's status and changes in their medical condition after observing that the patient was experiencing seizures that may not have been associated with substance use withdrawals given the timing, duration and number of such seizures;

v.  Timely and appropriately follow the national standards for evaluating individuals with status epilepticus;

w.  Timely recognize, communicate, advocate, and appropriately treat an individual

experiencing seizure activity within the first 0-5 minutes by stabilizing patient, timing the seizure from its onset, monitoring vital signs, assessing oxygenation, giving oxygen via nasal cannula/mask, collecting finger stick blood glucose and appropriately administering medication;

x.  Upon a certain scoring on the monitoring scale of CIWA-Ar, to timely and appropriately follow the prescribed medical treatment plan for a patient;

y.  Properly supervise any nurse ensuring they adequately treat a patient suffering from alcohol and / or benzodiazepine withdrawals, seizures or the life-threatening condition of status epilepticus;

z.  Timely collaborate with appropriate physicians and clinicians to establish optimal treatment plans and to achieve favorable patient outcomes;

aa. Recognize, communicate and advocate the need and urgency of timely administering appropriate medications to prevent prolonged alcohol and/or benzodiazepine withdrawals and seizures;

bb. Recognize, communicate and advocate the need and urgency of timely performing interventions for a patient experiencing status epilepticus;

cc. Recognize, communicate and advocate the need and urgency of immediate hospitalization and/or immediate physician medical treatment for alcohol and/or benzodiazepine withdrawal syndrome and/or status epilepticus;

dd. Other acts of professional negligence yet to be determined.

232.  At all times relevant to the care and treatment of Paul Bulthouse, Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent in the care and treatment of Decedent.

233.    The above breaches of the standard of care by Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., were the proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

234.    The above breaches of the standard of care by Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

235.    That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

236.    Defendant Wellpath, through its agents and employees, including but not limited to, Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

237.    Defendant Muskegon County through his agents and employees, upon information and belief including but not limited to, Defendant Carleen Blanch, R.N., and Defendant Aubrey Schotts, R.N., is liable for its professional negligence pursuant to the doctrine of *respondeat*

*superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

238.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Carleen Blanche, RN, and Defendant Aubrey Schotts, RN.

239.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Carleen Blanche, RN, and Defendant Aubrey Schotts, RN.

240.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

  a.  Death;

  b.  Reasonable medical, hospital, funeral and burial expenses;

  c.  Conscious pain and suffering, physical and emotional;

  d.  Humiliation and/or mortification;

  e.  Mental anguish;

  f.  Economic damages;

  g.  Loss of love, society, and companionship;

  h.  Loss of gifts, gratuities, and other items of economic value;

  i.  Parental and spousal guidance, training, and support;

  j.  Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

  k.  Attorney fees and costs if applicable;

l.      Any and all other damages otherwise recoverable under federal law and the

Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF

THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a

judgment against Defendants in an amount in excess of SEVENTY-FIVE THOUSAND

($75,000.00) DOLLARS, plus costs, interest and attorney fees.

### COUNT XI
### MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE
### (DEFENDANT JESSICA ANN FAIRBANKS, LPN, DEFENDANT ASHLEIGH
### SEVERANCE, LPN, DEFENDANT DANIELLE CARLSON, LPN and DEFENDANT
### DAVID LOPEZ, LPN)

241.    Plaintiff hereby restates and re-alleges each and every allegation contained in the

above paragraphs as if fully set forth herein.

242.    In treating Paul Bulthouse, Defendant Jessica Ann Fairbanks, LPN, Defendant

Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN

were required to provide the recognized standard of practice or care within their specialty as a

licensed practical nurse and were required to render care as a reasonable and prudent licensed

practical nurse of average training, experience and education under the same or similar clinical

circumstances as pertains to Paul Bulthouse as reasonably applied in light of the facilities available

in the community or other facilities reasonably available under the circumstances, pertaining to

their rendering care to Plaintiff's decedent Paul Bulthouse. (The Affidavit of Merit of Denise

Panosky, R.N., is attached hereto)

243.    The applicable standard of practice/care required that Defendant Jessica Ann

Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and

Defendant David Lopez, LPN, timely and appropriately do all of the following, which they failed to do, and are therefore, professionally negligent:

a. Exercise that degree of reasonable judgment and provide appropriate care that a reasonable licensed practical nurse would under same or similar circumstances;

b. Be familiar with and comply with national and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or exhibiting signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

c. Timely, appropriately, safely and effectively treat withdrawal symptoms and syndromes;

d. Timely and appropriately complete a patient's medical history and medications prescribed for patients that present with and/or exhibit signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

e. Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, tachycardia, head/brain trauma, seizures and hypertension are at greater risk for severe withdrawal symptoms and complications thus mandating closer monitoring by appropriately trained nursing personnel;

f. Timely and appropriately provide medications, and ongoing monitoring in treating patients who suffer from neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension who exhibit symptoms of alcohol and/or benzodiazepine withdrawal or seizures;

g.  Timely and appropriately recognize that a patient's symptoms and signs of withdrawal such as but not limited to seizures, delirium tremens, delirium hallucinations, changes in consciousness, profound agitation, and autonomic instability, require hospitalization;

h.  Timely and appropriately recognize that the monitoring scale of CIWA-Ar is to not be used for benzodiazepine withdrawal as stated by the Federal Bureau of Prisons and to adequately monitor such benzodiazepine withdrawal to decrease the progression of withdrawal symptoms from early withdrawal to mid withdrawal to late withdrawal requiring hospitalization;

i.  Timely and appropriately report and/or provide a patient, who was exhibiting signs of alcohol and/or benzodiazepine withdrawal, vital signs and cardiovascular, neurologic and mental health status;

j.  Timely and appropriately recognize that a patient is at high risk for developing alcohol and/or benzodiazepine withdrawals and that such conditions can be life-threatening if not properly managed by a physician or psychiatrist and to report such;

k.  Timely and adequately provide appropriate care and monitoring for a patient who is suffering from insomnia, delirium tremens, and alcohol withdrawal, benzodiazepine withdrawals and /or seizures;

l.  Perform timely and accurate patient risk for delirium tremens and alcohol withdrawal and appreciate a thorough history;

m.  Keep apprised of the patient's status and changes in their condition after observing that he was experiencing symptoms associated with alcohol and/or benzodiazepine withdrawal or a seizure;

n.  Timely and appropriately recognize that a patient is experiencing a serious medical

condition in the form of reoccurring seizures and/or status epilepticus and that such a condition can be life threatening if not properly managed by a qualified physician and/or immediate hospitalization;

o.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and provide proper medications and hospitalization;

p.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and ensure that the patient undergoes medical treatment for this urgent and life-threatening medical condition.

q.  Keep apprised of the patient's status and changes in their medical condition after observing that the patient was experiencing seizures that may not have been associated with substance use withdrawals given the timing, duration and number of such seizures;

r.  Timely and appropriately follow the national standards for evaluating and treating individuals with status epilepticus;

s.  Timely recognize, communicate, advocate, and appropriately treat an individual experiencing seizure activity within the first 0-5 minutes by stabilizing patient, timing the seizure from its onset, monitoring vital signs, oxygenation, giving oxygen via nasal cannula/mask, collecting finger stick blood glucose and appropriately administering medication;

t.  Upon a certain scoring on the monitoring scale of CIWA-Ar, to timely and appropriately follow the prescribed medical treatment plan for a patient;

u.  Recognize, communicate and advocate the need and urgency of timely administering appropriate medications, including immediate hospitalization, to prevent prolonged alcohol and/or benzodiazepine withdrawals and seizures;

v.   Recognize, communicate and advocate the need and urgency of timely performing interventions for a patient experiencing status epilepticus;

w.   Recognize, communicate and advocate the need and urgency of immediate hospitalization and/or immediate physician medical treatment for alcohol and/or benzodiazepine withdrawal syndrome and/or status epilepticus;

x.   Other acts of professional negligence yet to be determined.

244.    At all times relevant to the care and treatment of Paul Bulthouse, Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN, failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent in the care and treatment of Decedent.

245.    The above breaches of the standard of care by Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN, were the proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

246.    The above breaches of the standard of care by Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN, were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

247.    That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial

support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

248.    Defendant Wellpath, through its agents and employees, including but not limited to, Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

249.    Defendant Muskegon County through his agents and employees, upon information and belief including but not limited to, Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

250.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN.

251.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Jessica Ann Fairbanks, LPN, Defendant Ashleigh Severance, LPN, Defendant Danielle Carlson, LPN, and Defendant David Lopez, LPN.

252.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs if applicable;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a judgment against Defendants in an amount in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, plus costs, interest and attorney fees.

## COUNT XII
## MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT RICHELE MARION, EMT, DEFENDANT BRITNI BRINKMAN, EMT, and DEFENDANT SARA BRUCE, EMT)

253.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

254.    In treating Paul Bulthouse, Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, were required to provide the recognized standard of practice or care within their specialty as an Emergency Medical Technician and were required to render care as a reasonable and prudent emergency medical technician of average training, experience and education under the same or similar clinical circumstances as pertains to Paul Bulthouse as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, pertaining to their rendering care to Plaintiff's decedent Paul Bulthouse. (The Affidavit of Merit of John Everlove, BA, NRP is attached hereto)

255.    The applicable standard of practice/care required that Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, timely and appropriately do all of the following, which they failed to do, and are, therefore, professionally negligent:

a.  Exercise that degree of reasonable medical judgment and provide appropriate medical care that a reasonable emergency medical technician would under same or similar circumstances;

b.  Be familiar with and comply with national and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or exhibiting signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

c.  Timely and appropriately assess whether a patient suffers from a substance use disorder and safely and effectively treat withdrawal symptoms and syndromes;

d.  Timely and appropriately complete an assessment of a patient's medical history and

medications prescribed to properly engage a proper withdrawal plan with necessary medications and tapering schedules for patients that present with and/or exhibit signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

e.  Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, tachycardia, head/brain trauma, seizures and hypertension are at greater risk for severe withdrawal symptoms and complications thus mandating closer monitoring by appropriately trained medical personnel;

f.  Timely and appropriately provide medications, medical assessments, and ongoing monitoring in treating patients who suffer from neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension who exhibit symptoms of alcohol and/or benzodiazepine withdrawal or seizures;

g.  Timely and appropriately recognize that a patient's symptoms and signs of withdrawal such as but not limited to seizures, delirium tremens, delirium hallucinations, changes in consciousness, profound agitation, and autonomic instability, require hospitalization and provide immediate hospitalization;

h.  Timely and appropriately refer a psychological or psychiatric evaluation of patient;

i.  Timely and appropriately recognize that the monitoring scale of CIWA-Ar is to not be used for benzodiazepine withdrawal as stated by the Federal Bureau of Prisons and to adequately monitor such benzodiazepine withdrawal to decrease the progression of withdrawal symptoms from early withdrawal to mid withdrawal to late withdrawal requiring hospitalization;

j.   Timely and appropriately report to a physician and/or provide a patient, who was exhibiting signs of alcohol and/or benzodiazepine withdrawal, a targeted physical examination that includes vital signs and an evaluation of cardiovascular, neurologic and mental health status;

k.   Timely and appropriately recognize that a patient is at high risk for developing alcohol and/or benzodiazepine withdrawals and that such conditions can be life-threatening if not properly managed by a physician or psychiatrist and to report such to a physician or psychiatrist;

l.   Ensure that the properly trained medical personnel perform an examination and develop an assessment and treatment plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from seizures, namely status epilepticus;

m.   Timely and adequately perform an examination and develop an assessment and treatment plan of a patient exhibiting withdrawal needs from alcohol and/or benzodiazepine and/or suffering from a serious medical condition such as seizures, namely status epilepticus with a physician;

n.   Timely and adequately provide appropriate care, monitoring, and treatment for a patient who is suffering from insomnia, delirium tremens, and alcohol withdrawal, benzodiazepine withdrawals and /or seizures;

o.   Perform timely and accurate comprehensive assessments and examination of the patient to assess his risk for delirium tremens and alcohol withdrawal and appreciate a thorough history and mental health examination when the history provided is that the examinee is going through the delirium tremens for alcohol withdrawal;

p.  Keep apprised of the patient's status and changes in their condition after observing that he was experiencing symptoms associated with alcohol and/or benzodiazepine withdrawal or a seizure;

q.  Timely and appropriately recognize and/or diagnose that a patient is experiencing a serious medical condition in the form of reoccurring seizures and/or status epilepticus and that such a condition can be life threatening if not properly managed by a qualified physician and/or immediate hospitalization;

r.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and provide proper medications and hospitalization;

s.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of status epilepticus and ensure that the patient undergoes medical treatment for this urgent and life-threatening medical condition;

t.  Keep apprised of the patient's status and changes in their medical condition after observing that the patient was experiencing seizures that may not have been associated with substance use withdrawals given the timing, duration and number of such seizures;

u.  Timely and appropriately follow the national standards issued by the American Epilepsy Society guideline for evaluating and treating individuals with status epilepticus;

v.  Timely and appropriately consult with the patient's primary care physician or proscribing doctor regarding the results of any jail medical assessments and evaluations of the patient so as to obtain proper medical treatment for them;

w.  Upon a certain scoring on the monitoring scale of CIWA-Ar, to timely and

appropriately follow the prescribed medical treatment plan for a patient;

x. Timely consult and collaborate with appropriate physician specialists, such as neurologists and other clinicians, to establish optimal treatment plans and to achieve favorable patient outcomes;

y. Recognize, communicate and advocate the need and urgency of timely administering appropriate medications, including immediate hospitalization, to prevent prolonged alcohol and/or benzodiazepine withdrawals and seizures;

z. Recognize, communicate and advocate the need and urgency of immediate hospitalization and/or immediate physician medical treatment for alcohol and/or benzodiazepine withdrawal syndrome and/or status epilepticus;

aa. Timely and appropriately follow the protocols as promulgated by a State of Michigan Medical Control Authority for treating patients that present with and/or exhibit signs and symptoms of substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, seizures, status epilepticus and hypertension;

bb. Other acts of professional negligence yet to be determined.

256. At all times relevant to the care and treatment of Paul Bulthouse, Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent in the care and treatment of Decedent.

257. The above breaches of the standard of care by Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, were the proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use

disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

258. The above breaches of the standard of care by Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

259. That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

260. Defendant Wellpath, through its agents and employees, including but not limited to, Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

261. Defendant Muskegon County through his agents and employees, upon information and belief including but not limited to Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

262. Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of

ordinary negligence against Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT.

263.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Richele Marion, EMT, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT.

264.     That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

     a.     Death;

     b.     Reasonable medical, hospital, funeral and burial expenses;

     c.     Conscious pain and suffering, physical and emotional;

     d.     Humiliation and/or mortification;

     e.     Mental anguish;

     f.     Economic damages;

     g.     Loss of love, society, and companionship;

     h.     Loss of gifts, gratuities, and other items of economic value;

     i.     Parental and spousal guidance, training, and support;

     j.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

     k.     Attorney fees and costs if applicable;

     l.     Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a judgment against Defendants in an amount in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, plus costs, interest and attorney fees.

**COUNT XIII**
**PROFESSIONAL NEGLIGENCE/ NEGLIGENCE/GROSS NEGLIGENCE**
**(DEFENDANT JOSEPH NATOLE, JR., M.D. P.C.)**

265. Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

266. Defendant Joseph Natole, Jr., M.D. P.C., through its agents and employees, failed in all respects to comply with the applicable standard of care pursuant to MCL 333.21513 and MCL 333.20141, and in conformance thereof, to:

a. Provide Paul Bulthouse proper medical care based on his own medical history;

b. Employ or contract with physicians and residents who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

c. Adequately supervise, direct, monitor and control these healthcare providers;

d. Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies, and procedures which would enable and engender its healthcare providers, including but not limited to, its physicians and residents, to render appropriate and timely treatment to patients looking to it for said treatment, including Paul Bulthouse, and ensure the adequacy of the experience level and expertise of these providers;

e. Defendant Joseph Natole, Jr., M.D. P.C., will be held vicariously liable for the professional actions of its agents, employees and ostensible agents as a matter of

law, including but not limited to, Defendant Dr. Joseph Natole, M.D.

      f.   Other acts of professional negligence yet to be determined.

267.   The above breaches of the standard of care by Defendant Joseph Natole, Jr., M.D. P.C., were the proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

268.   The above breaches of the standard of care by Defendant Joseph Natole, Jr., M.D. P.C. were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

269.   That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

270.   Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Dr. Natole.

271.   Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Dr. Natole.

272.    That the above described conduct of Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

      a.      Death;

      b.      Reasonable medical, hospital, funeral and burial expenses;

      c.      Conscious pain and suffering, physical and emotional;

      d.      Humiliation and/or mortification;

      e.      Mental anguish;

      f.      Economic damages;

      g.      Loss of love, society, and companionship;

      h.      Loss of gifts, gratuities, and other items of economic value;

      i.      Parental and spousal guidance, training, and support;

      j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

      k.      Attorney fees and costs if applicable;

      l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a judgment against Defendants in an amount in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, plus costs, interest and attorney fees.

## COUNT XIV
## PROFESSIONAL NEGLIGENCE/ NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT WELLPATH)

273.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

274.    Defendant Wellpath through its agents and employees, failed in all respects to comply with the applicable standard of care pursuant to MCL 333.21513 and MCL 333.20141, and in conformance thereof, to:

    a.  Provide Paul Bulthouse proper medical care based on his own medical history;

    b.  Employ or contract with physicians, nurses, emergency technicians and paramedics who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

    c.  Adequately supervise, direct, monitor and control these healthcare providers;

    d.  Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies, and procedures which would enable and engender its healthcare providers, including but not limited to, its physicians, nurses, emergency technicians and paramedics, to render appropriate and timely treatment to patients looking to it for said treatment, including Paul Bulthouse, and ensure the adequacy of the experience level and expertise of these providers;

    e.  Defendant Wellpath LLC will be held vicariously liable for the professional actions of its agents, employees and ostensible agents as a matter of law, including but not limited to Defendant Medical Personnel.

    f.  Other acts of professional negligence yet to be determined.

275.    The above breaches of the standard of care by Defendant Wellpath were the proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status

epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

276.     The above breaches of the standard of care by Defendant Wellpath were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

277.     That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

278.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Medical Personnel.

279.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Medical Personnel.

280.     That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

     a.     Death;

     b.     Reasonable medical, hospital, funeral and burial expenses;

     c.     Conscious pain and suffering, physical and emotional;

d. Humiliation and/or mortification;

e. Mental anguish;

f. Economic damages;

g. Loss of love, society, and companionship;

h. Loss of gifts, gratuities, and other items of economic value;

i. Parental and spousal guidance, training, and support;

j. Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k. Attorney fees and costs if applicable;

l. Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a judgment against Defendants in an amount in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, plus costs, interest and attorney fees.

## COUNT XV
## PROFESSIONAL NEGLIGENCE/ NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT MUSKEGON COUNTY)

281. Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

282. Defendant Muskegon County, through its agents and employees, failed in all respects to comply with the applicable standard of care pursuant to MCL 333.21513 and MCL 333.20141, and in conformance thereof, to:

a. Provide Paul Bulthouse proper medical care based on his own medical history;

b.   Employ or contract with physicians, nurses, emergency technicians and paramedics who possess  that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

c.   Adequately supervise, direct, monitor and control these healthcare providers;

d.   Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies, and procedures which would enable and engender its healthcare providers, including but not limited to its physicians, nurses, emergency technicians and paramedics to render appropriate and timely treatment to patients looking to it for said treatment, including Paul Bulthouse, and ensure the adequacy of the experience level and expertise of these providers;

e.   Defendant Muskegon County will be held vicariously liable for the professional actions of its agents, employees and ostensible agents as a matter of law, upon information and belief including but not limited to Defendant Medical Personnel;

f.   Other acts of professional negligence yet to be determined.

283.    The above breaches of the standard of care by Defendant Muskegon County were the proximate cause of Paul Bulthouse's untreated prolonged seizure activity, also known as status epilepticus, which resulted due to the lack of diagnosis, treatment, and monitoring of Paul Bulthouse's substance use disorder, alcohol withdrawal, benzodiazepine withdrawal, neurological disorder, tachycardia, head/brain trauma, and/or hypertension.

284.    The above breaches of the standard of care by Defendant Muskegon County were the proximate cause of Paul Bulthouse's pain, suffering and subsequent death.

285.    That as a further consequence of the negligence described above, Plaintiff's decedent Paul Bulthouse, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate

cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as he is entitled under the Wrongful Death Act, MCL 600.2922.

286. Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Medical Personnel.

287. Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Medical Personnel.

288. That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

      a.     Death;

      b.     Reasonable medical, hospital, funeral and burial expenses;

      c.     Conscious pain and suffering, physical and emotional;

      d.     Humiliation and/or mortification;

      e.     Mental anguish;

      f.     Economic damages;

      g.     Loss of love, society, and companionship;

      h.     Loss of gifts, gratuities, and other items of economic value;

      i.     Parental and spousal guidance, training, and support;

      j.     Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

       k.       Attorney fees and costs if applicable;

       l.       Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE Plaintiff JOHN BULTHOUSE, PERSONAL REPRESENTATIVE OF THE ESTATE OF Paul Bulthouse, respectfully requests that this Honorable Court enter a judgment against Defendants in an amount in excess of SEVENTY-FIVE THOUSAND ($75,000.00) DOLLARS, plus costs, interest and attorney fees.

## COUNT XVI
## STATE LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (DEFENDANT DEPUTIES AND DEFENDANT MEDICAL PERSONNEL)

289.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

290.    In the manner described more fully above, Defendant Deputies and Defendant Medical Personnel engaged in extreme and outrageous conduct.

291.    By subjecting Paul Bulthouse to deliberate indifference to his serious medical needs, cruel and unusual punishment and the being subjected to excessive force, Defendant Deputies and Defendant Medical Personnel either intended that their conduct would cause severe emotional distress to Paul Bulthouse or knew that there was a high probability that their conduct would cause severe emotional distress to him.

292.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

293.    As a proximate result of this misconduct, undertaken pursuant to the Defendant Muskegon County and Defendant Wellpath's policy and practice as described above, Paul Bulthouse suffered injuries including but not limited to severe emotional distress.

294.    That the above-described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Paul Bulthouse's death and other injuries and damages to him and his Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs if applicable;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

Respectfully submitted,

By:  /s/ Marcel S. Benavides

Marcel S. Benavides, P69562
Attorney for PLAINTIFF
801 W. Eleven Mile Road, Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net

Dated:  March 29, 2021

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

JOHN BULTHOUSE Individually and as
Personal Representative for the Estate of
Paul Bulthouse, Deceased

     PLAINTIFF

     -vs-                                       Case No.

                                                HON.

COUNTY OF MUSKEGON, a municipal corporation, and
SHERIFF MICHAEL POULIN; LT. MARK BURNS;
SGT. DAVID VANDERLAAN; DEPUTY BRITTANY MILLER;
DEPUTY JESSIE OLSON; DEPUTY CRYSTAL GREVE;
DEPUTY JUSTIN WALL; DEPUTY CHRISTOPHER GRAVIANO;
DEPUTY BRADLEY PERRI; DEPUTY JAMAL LANE;
DEPUTY JEFFERY PATTERSON; DEPUTY SHAWN BAKER;
and other UNKNOWN DEPUTIES;
WELLPATH, LLC, formerly known as CORRECT CARE SOLUTIONS, LLC;
JOSEPH NATOLE, JR., M.D. P.C.; DR. JOSEPH NATOLE, M.D.;
CARLEEN BLANCHE, RN; AUBREY SCHOTTS, RN;
JESSICA ANN FAIRBANKS, LPN; ASHLEIGH SEVERANCE, LPN;
DANIELLE CARLSON, LPN; DAVID LOPEZ, LPN;
RICHELE MARION, EMT; BRITNI BRINKMAN, EMT;
SARA BRUCE, EMT; JANE DOE; and JOHN DOE;
Individually, and in their official / supervisory capacities,
Jointly and Severally,

     DEFENDANTS.                         JURY TRIAL DEMANDED
_____/

**MARCEL S. BENAVIDES (P69562)**
THE MARCEL S. BENAVIDES LAW OFFICE
Attorney for PLAINTIFF
801 West Eleven Mile Rd. Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net
_____/

## PLAINTIFF DEMANDS A TRIAL BY JURY

**NOW COMES** the PLAINTIFF, John Bulthouse, individually and as Personal Representative for the Estate of Paul Bulthouse ("Decedent"), and through his attorney, **MARCEL S. BENAVIDES**, and demands a trial by jury in this matter.

Respectfully submitted,

By:    /s/ Marcel S. Benavides

Marcel S. Benavides, P69562
Attorney for PLAINTIFF
801 W. Eleven Mile Road, Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net

Dated: March 29, 2021